# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## FORM 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
For the fiscal year ended December 31, 2006.

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
For the transition period from            to
Commission File Number 001-15153

# BLOCKBUSTER INC.
### (Exact name of registrant as specified in its charter)

| **DELAWARE** | **52-1655102** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |

**1201 Elm Street**
**Dallas, Texas 75270**
**(214) 854-3000**
(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Class A Common Stock, $.01 par value per share | New York Stock Exchange |
| Class B Common Stock, $.01 par value per share | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☒   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer (as defined in Rule 12b-2 of the Act).   Large accelerated filer ☒   Accelerated filer ☐   Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).   Yes ☐   No ☒

As of June 30, 2006, which was the last business day of the registrant's most recently completed second fiscal quarter, the aggregate market value of the registrant's common stock held by non-affiliates was $826,416,329, based on the closing price of $4.98 per share of Class A common stock and $4.39 per share of Class B common stock as reported on the New York Stock Exchange composite tape on that date.

As of February 26, 2007, 120,143,244 shares of Class A common stock, $0.01 par value per share, and 72,000,000 shares of Class B common stock, $0.01 par value per share, were outstanding.

Dockets.Justia.com

## DOCUMENTS INCORPORATED BY REFERENCE

Portions of our definitive proxy statement to be filed for our 2007 annual meeting of stockholders are incorporated by reference into Part III of this Form 10-K.

THIS ANNUAL REPORT ON FORM 10-K IS BEING DISTRIBUTED TO STOCKHOLDERS IN LIEU OF A SEPARATE ANNUAL REPORT PURSUANT TO RULE 14a-3(b) OF THE ACT AND SECTION 203.01 OF THE NEW YORK STOCK EXCHANGE LISTED COMPANY MANUAL.

# BLOCKBUSTER INC.
## TABLE OF CONTENTS TO FORM 10-K

| | | | Page |
|---|---|---|---:|
| **PART I** | | | |
| Item 1. | Business | | 1 |
| Item 1A. | Risk Factors | | 21 |
| Item 1B. | Unresolved Staff Comments | | 36 |
| Item 2. | Properties | | 36 |
| Item 3. | Legal Proceedings | | 37 |
| Item 4. | Submission of Matters to a Vote of Security Holders | | 37 |
| **PART II** | | | |
| Item 5. | Market for Our Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | | 38 |
| Item 6. | Selected Financial Data | | 38 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | | 40 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | | 62 |
| Item 8. | Financial Statements and Supplementary Data | | 63 |
| Item 9. | Changes In and Disagreements With Accountants on Accounting and Financial Disclosure | | 124 |
| Item 9A. | Controls and Procedures | | 124 |
| Item 9B. | Other Information | | 125 |
| **PART III** | | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | | 126 |
| Item 11. | Executive Compensation | | 126 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | | 126 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | | 127 |
| Item 14. | Principal Accounting Fees and Services | | 127 |
| **PART IV** | | | |
| Item 15. | Exhibits and Financial Statement Schedules | | 128 |

## DISCLOSURE REGARDING FORWARD-LOOKING INFORMATION

This annual report on Form 10-K contains "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. Forward-looking statements may also be included from time to time in our other public filings, press releases, our website and oral and written presentations by management. Specific forward-looking statements can be identified by the fact that they do not relate strictly to historical or current facts and include, without limitation, words such as "may," "will," "expects," "believes," "anticipates," "plans," "estimates," "projects," "targets," "seeks," "could," "intends," "foresees" or the negative of such terms or other variations on such terms or comparable terminology. Similarly, statements that describe our strategies, initiatives, objectives, plans or goals are forward-looking.

These forward-looking statements are based on management's current intent, belief, expectations, estimates and projections regarding our Company and our industry. These statements are not guarantees of future performance and involve risks, uncertainties, assumptions and other factors that are difficult to predict. Therefore, actual results may vary materially from what is expressed in or indicated by the forward-looking statements. The risk factors set forth below under "Item 1A. Risk Factors," and other matters discussed from time to time in subsequent filings with the Securities and Exchange Commission, including the "Disclosure Regarding Forward-Looking Information" and "Risk Factors" sections of our Quarterly Reports on Form 10-Q, among others, could affect future results, causing these results to differ materially from those expressed in our forward-looking statements. In that event, our business, financial condition, results of operations or liquidity could be materially adversely affected and investors in our securities could lose part or all of their investments. Accordingly, our investors are cautioned not to place undue reliance on these forward-looking statements because, while we believe the assumptions on which the forward-looking statements are based are reasonable, there can be no assurance that these forward-looking statements will prove to be accurate.

Further, the forward-looking statements included in this Form 10-K and those included from time to time in our other public filings, press releases, our website and oral and written presentations by management are only made as of the respective dates thereof. We undertake no obligation to update publicly any forward-looking statement in this Form 10-K or in other documents, our website or oral statements for any reason, even if new information becomes available or other events occur in the future.

# PART I

**Item 1.** *Business*

## BLOCKBUSTER OVERVIEW

Blockbuster Inc. is a leading global provider of in-home rental and retail movie and game entertainment, with over 8,000 stores in the United States, its territories and 22 other countries as of December 31, 2006.

We operate in the highly competitive home video and home video game industries, which include in-home movie (i.e., theatrical movie, television series and direct-to-video product) and game entertainment offered primarily by traditional (i.e., "in-store") retail outlets, online retailers, cable and satellite providers and via digital distribution over the Internet. We believe our offering of both in-store and online movie rental, in-store game rental and in-store retail products has uniquely positioned us to meet the entertainment needs of our customers. However, the increasing availability of in-home entertainment through delivery methods other than traditional in-store models and other leisure activities have led to significant challenges for us and resulted in the continued decline in the in-store home video rental industry.

During 2006, we were committed to executing on a business plan that focuses on growing our share of the overall movie rental business, controlling costs, maximizing our asset portfolio and improving our profitability and cash flow. We believe that the successful execution of this business plan is essential to combat the significant challenges which continue to face the in-store home video rental industry. In addition, we continue to develop our core rental offering by utilizing our in-store and online rental business and our "no late fees" program. We believe that our ability to integrate our in-store and online rental business creates a distinct competitive advantage by providing a rental offering which no other company currently provides. To further the integration of our in-store and online rental business, we introduced BLOCKBUSTER Total Access™ which allows our customers the option of exchanging their DVDs through the mail or returning them to a nearby participating BLOCKBUSTER® store in exchange for free in-store movie rentals. The success and strong consumer appeal of BLOCKBUSTER Total Access has enabled us to exceed our goal of two million online subscribers as of December 31, 2006.

We also continue to review our asset portfolio with a focus on optimizing profitability through our core Blockbuster branded rental businesses. As a result, during 2006, we closed stores where the economics were beneficial to our business and divested a significant number of our non-Blockbuster branded stores.

### Domestic Operations

#### *In-Store*

As of December 31, 2006, we had 5,194 stores operating under the BLOCKBUSTER brand and RHINO VIDEO GAMES® brand in the United States and its territories. Of the 5,194 stores, 939 were operated through our franchisees. The stores operating under the BLOCKBUSTER brand primarily offer movie and game rental and new and traded movie and game product to our customers. Additionally, some of these locations include a game store-in-store concept operating under the GAME RUSH® brand. The stores operating under the RHINO VIDEO GAMES brand primarily offer new and traded games.

During 2006, we completed the divestiture of our Movie Brands Inc. subsidiary and our MOVIE TRADING CO.® locations in order to focus on our core Blockbuster branded stores. Additionally, during January 2007, we completed the sale of RHINO VIDEO GAMES.

#### *Online*

In mid-2004, we launched our online subscription service in the United States and a smaller online subscription service in the United Kingdom. Our internet-based subscription services allow customers to rent

1

DVDs by mail and offer substantially more titles than our stores, including a wide array of both new release and catalog DVDs. As noted above, we believe the integration of our in-store and online rental business provides us with a distinct competitive advantage that was further enhanced with the introduction of BLOCKBUSTER Total Access on November 1, 2006. This program gives our customers the option of exchanging their DVDs through the mail or returning them to a nearby participating BLOCKBUSTER store in exchange for free in-store movie rentals. In addition, BLOCKBUSTER Total Access customers also receive free in-store rental coupons each month, which may be used toward movie or game rentals. We believe that our online rental offering allows us to attract and retain additional customers by providing them with the convenience of renting movies online or in-store. Additionally, our online business allows us to reach customers located in a geographic area where we do not presently have a convenient store location.

Our online subscription service in the U.S. requires significant ongoing subscriber acquisition investment in order to tap into this growing market and build a customer base large enough to allow this business to be profitable. As of December 31, 2006, we had approximately 2.2 million online subscribers, including approximately 2.0 million paying subscribers. During 2007, we anticipate our online subscriber growth to exceed full-year 2006 levels and expect to have a total of three million BLOCKBUSTER Total Access subscribers by the end of the first quarter of 2007.

**International Operations**

As of December 31, 2006, we had 3,166 stores operating under the BLOCKBUSTER brand and other brand names owned by us located in 22 markets outside of the United States. Of these stores, 870 were operated through our franchisees. In the Republic of Ireland and Northern Ireland, we operate under the XTRA-VISION® brand name due to its strong local brand awareness. In the United Kingdom, we operate freestanding and store-in-store game locations under the brand name GAMESTATION®. In Canada, Italy, Mexico and Denmark, we also operate freestanding and store-in-store game locations under the GAME RUSH brand. In 2006, 34.5% of our worldwide revenues were generated outside of the United States, compared to 32.5% in 2005. As discussed in more detail below in "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations," the overall increase in revenues generated outside of the United States reflects the continued growth in international retail sales, the addition of freestanding game stores in certain international markets and the impact of favorable foreign exchange rates. Our international operations are more dependent on retail sales and, in particular, the retail game industry. During 2006, retail sales comprised approximately 50% of our international revenues, which were largely driven by the freestanding and store-in-store game locations discussed above. Additional information regarding our revenues and long-lived assets by geographic area is included in Note 12 to the consolidated financial statements.

During 2006, we closed all of our store locations in Spain due to continuing deterioration in market conditions, including piracy. In addition, we sold our Taiwan subsidiary, coupled with a master franchise license. Additionally, during 2007, we entered into an agreement to sell our Australian subsidiary, coupled with a master franchise license. We will continue to evaluate our international markets and make investment decisions based on local market conditions and our desire to better focus on key international markets. As part of our evaluation process, we may also consider the divestiture of or other alternatives with regard to some or all of our international operations upon acceptable terms.

We maintain offices for each major region and most of the countries in which we operate in order to manage, among other things, (i) store development and operations; (ii) marketing; and (iii) the purchase, supply and distribution of product.

# INDUSTRY OVERVIEW

## Domestic Home Video Industry—In-Home Movies

The overall home video industry includes in-home movie entertainment offered through the retail home video industry, the cable industry, the satellite industry and via digital distribution over the Internet. Of those distribution channels, the retail home video industry includes the sale and rental of movies on DVD and VHS by:

- traditional video store retailers such as Blockbuster and Movie Gallery;

- online retailers such as Blockbuster and Netflix; and

- other retailers, including mass merchant retailers such as Wal-Mart, Best Buy and Target.

*Consumer Spending.* According to estimates from Kagan Research, LLC ("Kagan"), consumer spending for in-home movie viewing in the overall home video industry increased from about $25.2 billion in 2005 to about $25.5 billion in 2006. Of the $25.5 billion in overall home video industry revenues during 2006, about $24.1 billion were generated by the retail home video industry. The remainder of the revenues for the overall home video industry were generated primarily by pay-per-view and other specialized cable and satellite services.

Of the $24.1 billion in revenues generated by the retail home video industry during 2006, about $16.9 billion were generated by sales of movies and about $7.2 billion were generated by in-store and online rentals of movies. This compared to about $16.4 billion of revenues that were generated by sales of movies and about $7.8 billion that were generated by in-store and online rentals of movies during 2005. While retail home video industry revenues are projected to be approximately $31.2 billion by 2011 due largely to anticipated increases in DVD sales, Kagan projects that movie rental revenues will continue to decline, from approximately $7.2 billion in 2006 to about $5.7 billion in 2011. The factors that are most expected to contribute to this decline are continued discounting by mass merchant retailers who are able to sell home video product at a price that is low enough to compete with rental pricing and competition from newer, more convenient digital distribution technologies.

Because of the many variables affecting movie rental revenues, it is difficult to predict fluctuations in the movie rental industry with certainty. For example, while Adams Media Research ("Adams") also predicts a decline in movie rental revenues going forward, they do not predict as substantial a decline as Kagan does. According to estimates from Adams, approximately $8.4 billion in rental revenues were generated in 2006, and rental revenues are projected to be approximately $8.0 billion in 2011.

We believe that rental will continue to provide a compelling proposition for consumers because movie rentals offer relatively low cost entertainment and because video rental stores and online rental websites provide a convenient opportunity for customers to browse from among a very broad selection of movie titles. According to estimates from Kagan, during 2006, rentals represented approximately 60.7% of the total number of industry transactions and sales represented approximately 39.3% of the total number of industry transactions. We believe that the DVD format, including the recent launch of high-definition DVD, will help sustain the rental industry. As more households purchase high-definition televisions, high-definition DVD will become more relevant and we believe that the difference between the retail price and the rental price of a high-definition DVD will be high enough to make rentals an attractive alternative for customers. Further, the current format war between HD-DVD and Blu-ray is also expected to benefit the rental industry because many consumers are holding out on purchasing high-definition DVDs in anticipation of which platform will become the high-definition standard.

In addition, we believe that our focus on increasing consumer satisfaction and on providing consumers with completely convenient access to movies will enhance the relevance of movie rentals and help drive rental business in the future. For example, during 2006, we introduced our BLOCKBUSTER Total Access program which provides our online customers with the flexibility to exchange their movies in-store at no extra cost, so they never have to be without a movie. Additionally, we also offer our "no late fees" program, our Guaranteed in Stock rental program and our in-store rental subscription programs.

*Studio Release Schedule to Home Video Retailers.* A competitive advantage that the U.S. retail home video industry has traditionally enjoyed over most other movie distribution channels, except theatrical release, is the early timing of its "distribution window." As discussed below under "—Worldwide Retail Home Video Industry—Key Source of Movie Studio Revenue," the retail home video industry is a critical source of revenue to U.S. movie studios. In order to maximize this revenue, studios release their movies to different distribution channels at different points in time. The first major distribution channel after theatrical release is currently home video (rental and retail, including mass merchant retail). The home video distribution window is typically exclusive against most other forms of non-theatrical movie distribution, such as pay-per-view, video-on-demand, premium television, basic cable and network and syndicated television. The length of this exclusive distribution window for home video retailers varies, but, since the mid-1990's, has averaged between 39 and 56 days for domestic home video retailers. Thereafter, movies are made sequentially available to the television distribution channels.

Recently, there has been increasing experimentation by studios and various movie content aggregators and retailers with the traditional distribution window, including simultaneous video-on-demand and DVD releases. For example, although movie selections tend to be limited at present, customers can now download to their computers certain available movies on the same day that the movie's DVD is released by the studios nationwide in retail stores for rental or sale, and in some cases consumers can also burn the downloaded movie to a blank DVD for playback in a DVD player, allowing them to watch the movies on their TVs or portable devices. We expect that the movie studios will continue to assess the traditional release windows and it is possible that the studios may decide to alter the traditional home video retailer distribution window for an increasing number of movies, particularly in connection with simultaneous video-on-demand distribution of movies and DVD release dates. We also believe, however, that the studios have a vested interest in maintaining the home video distribution window in a manner that allows them to maximize revenues generated by the retail home video industry.

In addition, although the distribution window is a significant advantage to the U.S. retail home video industry, its advantage to traditional video store retailers with core rental businesses has been diminished due to the sell-through pricing of DVDs. "Sell-through pricing," which became the norm in the late-1990's, is the process by which substantially all DVD titles are released at a price to the home video retailer that is low enough to allow for an affordable sales price by the retailer to the consumer from the beginning of the retail home video distribution window. Sell-through pricing has resulted in significant competition from mass merchant retailers because movies are released for rental and sale at the same time and are increasingly offered at deeply discounted prices that compete with rental pricing. Studio pricing is discussed further below under "—Our Operations—Suppliers and Purchasing Arrangements" and "Item 1A. Risk Factors—Changes in studio pricing policies have resulted in increased competition, in particular from mass merchant retailers, which has impacted consumer rental and purchasing behavior. We cannot control or predict future studio decisions or resulting consumer behavior, and future changes could negatively impact our profitability."

## International Home Video Industry—In-Home Movies

Some of the attributes of the home video industry outside of the United States are similar to those of the home video industry within the United States. For example, the major studios generally release movies outside of the United States according to sequential distribution windows. However, other attributes of the home video industry outside of the United States do not necessarily mirror the home video industry within the United States. For example, most countries have different systems of supply and distribution of movies, and competition in many of our international markets tends to be more fragmented. In addition, under the laws of some countries and trading blocs (*e.g.*, the European Union), home video retailers must obtain the right to rent videos to consumers through a licensing arrangement or a "purchase-with-the-right-to-rent" arrangement. Studios may charge these home video retailers more for product purchased for rental than product purchased solely for sale to consumers. This is commonly referred to as "two-tiered pricing," and it affects our European operations. Two-tiered pricing not only results in increased competition from mass merchant retailers in those countries and

4

trading blocs, it also creates increased competition with video rental outlets that operate in violation of the two-tiered pricing contractual limitations by renting product purchased at the lower retail price. The potential impact of studio pricing decisions is discussed under "Item 1A. Risk Factors—Changes in studio pricing policies have resulted in increased competition, in particular from mass merchant retailers, which has impacted consumer rental and purchasing behavior. We cannot control or predict future studio decisions or resulting consumer behavior, and future changes could negatively impact our profitability." The international home video industry also faces high levels of piracy. Although piracy is also a concern in the United States, it is having a more significant adverse affect on the rental and retail video industry in international markets. Piracy is discussed further below under "—Competition" and "Item 1A. Risk Factors—Piracy of the products we offer or the disregard of release dates by other retailers may adversely affect our operations."

## Worldwide Retail Home Video Industry—Key Source of Movie Studio Revenue

We believe that, of the many movies produced by major studios and released each year, relatively few are profitable for the movie studios based on box office revenues alone. For example, of the more than 600 movies released during 2006, only 18 grossed over $100 million at domestic theaters. As a result, the studios rely upon their distribution windows in order to maximize revenues. Sales and rentals of DVDs through the retail home video industry, which includes traditional video store retailers such as Blockbuster, as well as online and other retailers such as mass merchant retailers, continue to be the largest source of revenue to U.S. movie studios. According to estimates from Kagan, in 2006, the worldwide retail home video industry contributed approximately 50.7% of U.S. studios' revenues. Kagan projects that the contribution of retail home video to studios' revenues will be approximately the same in 2007.

We believe that sales and rentals by home video retailers will continue to be a key source of revenues for the movie studios. As discussed above, rentals provide particular benefits to the studios, as video rental stores and online rental websites acquire and rent movies that did not generate significant revenues in the theatrical box office, thus providing the movie studios with a reliable source of revenue for movies that would not be as popular for purchase. We believe that consumers are more likely to rent movies that were not box office hits because:

- the relatively low cost of a movie rental encourages consumers to rent movies they might not pay to view at a theater or desire to own; and
- video rental stores and online rental websites provide a convenient opportunity to browse from among a broad selection of movie titles.

As discussed above under "—Domestic Home Video Industry—In-Home Movies—Studio Release Schedule to Home Video Retailers," we believe there is significant economic incentive for the studios to maintain the retail home video distribution window. However, the order, length and exclusivity of each window for each distribution channel is determined solely by the studio releasing the movie.

## Home Video Game Industry

The home video game industry is complex and different in many ways from the home video industry. It has traditionally been affected by changing technology, limited hardware and software lifecycles, frequent introduction of new products and the popularity, price and timing of new hardware platforms and software titles. The home video game industry typically grows with the introduction of new hardware platforms and games, but tends to slow prior to the introduction of new platforms, as consumers hold back their purchases in anticipation of new platform and game enhancements. In addition, video games have significantly higher price points than DVDs.

According to estimates from The NPD Group, during 2006, total hardware unit sales in the United States increased approximately 10.6%, while hardware sales revenues increased by approximately 42.8%. This rather large increase in hardware sales revenues was primarily due to higher retail price points for next generation

hardware platforms. In addition, game software sales in the United States increased from approximately $6.1 billion in 2005 to approximately $6.5 billion in 2006. These increases were largely due to the rapid growth of portable gaming systems, particularly the Nintendo DS Lite, and the recent introduction of new, more advanced hardware platforms, including the Xbox 360, the Sony PlayStation 3 and the Nintendo Wii. As a result of the introduction of these next generation hardware platforms, we expect to see industry-wide game hardware and software sales continue to increase in 2007.

We believe that the cyclical nature of the home video game industry, along with the changing demographics of gaming households and the increasing number of competing game formats available, has contributed to the erratic nature of markets for game rentals, used games and games trading. With respect to game rentals, we believe that the difference between the retail price and the rental price of a popular new video game title is typically high enough to make rentals an attractive alternative for customers. In addition, we believe rental pricing provides both a testing ground for consumers considering a game purchase and an attractive alternative for customers who do not want to buy a game on an older format as they evaluate the purchase of a next generation hardware platform. However, it is also important to note that increased retail offerings of low-priced catalog, or "value," games, increased games trading by us and our competitors and growth in the online gaming sector compete with game rentals and sales of previously rented game product.

## Competition

We operate in a highly competitive environment. We believe our most significant competition comes from (i) retailers that rent, sell or trade movies and games, (ii) providers of direct delivery home viewing entertainment or other alternative delivery methods of entertainment content; (iii) piracy; and (iv) other forms of leisure entertainment.

*Competition with Retailers that Rent, Sell or Trade Movies and Games.* These retailers include, among others:

- mass merchant retailers, such as Wal-Mart, Best Buy and Target;
- local, regional and national video and game stores, such as Movie Gallery and GameStop;
- Internet sites and companies that rent or sell movies and other entertainment content, such as Netflix;
- toy and entertainment retailers; and
- supermarkets, pharmacies, convenience stores and fast food restaurants.

We believe that the principal factors we face in competing with retailers that rent, sell or trade movies and games are:

- consumer preference between purchasing and renting movies and games;
- alternative product distribution channels and the perceived convenience and ease of use of such alternative channels to the customer;
- pricing;
- convenience and visibility of store locations;
- quality, quantity and variety of titles in the desired format;
- customer service; and
- value-added services, such as movie search capabilities, ratings and recommendations and community features.

In particular, while the studios' promotion of DVDs for simultaneous sale and rental has served to lower the wholesale cost of DVDs to us, it has also resulted in increased competition from mass merchant retailers, as discussed under "Item 1A. Risk Factors—Changes in studio pricing policies have resulted in increased competition, in particular from mass merchant retailers, which has impacted consumer rental and purchasing behavior. We cannot control or predict future studio decisions or resulting consumer behavior, and future changes could negatively impact our profitability."

*Competition with Providers of Direct Delivery Home Viewing Entertainment or Other Alternative Delivery Methods of Entertainment Content.* We believe that a competitive risk to our business comes from direct broadcast satellite, digital cable television, high-speed Internet access and other alternatives for delivering videos and entertainment content to consumers. These providers offer an expanded number of conventional channels and expanded programming, including sporting events, through these services. Direct broadcast satellite, digital cable and "traditional" cable providers not only offer numerous channels of conventional television, they also offer pay-per-view movies, which permit a subscriber to pay a fee to see a selected movie, and other specialized movie services. Many digital cable providers, Internet content providers and other companies also provide "video-on-demand," which transmits movies and other entertainment content on demand with interactive capabilities such as start, stop and rewind. Other examples of alternative delivery methods of entertainment content include personal video recorders, download-to-burn DVDs, video vending machines and download-to-burn kiosks, video downloads to portable devices and disposable DVDs. Any consolidation or vertical integration of media companies to include both content providers and digital distributors could pose additional competitive risk to our business. Risks associated with this competition are discussed further under "Item 1A. Risk Factors—We cannot predict the impact that the following may have on our business: (i) new or improved technologies or video formats, (ii) alternative methods of content delivery or (iii) changes in consumer behavior facilitated by these technologies or formats and alternative methods of content delivery. We also compete generally for the consumer's entertainment dollar and leisure time." and "Item 1A. Risk Factors—Our business would lose a competitive advantage if the movie studios were to shorten or eliminate the home video retailer distribution window or otherwise adversely change their current practices with respect to the timing of the release of movies to the various distribution channels." We expect to enter the digital downloading business in a cost-effective manner sometime this year.

*Piracy.* We compete against the illegal copying and sale of movies and video games. Because piracy is an illegal activity, it is difficult to quantify its exact impact on the home video industry. The primary methods of piracy affecting the home video industry are (i) the illegal copying of theatrical films at the time they are first run, (ii) the illegal copying of DVDs that are authorized by the studios solely for retail sale and/or rental by authorized retailers and (iii) the illegal online downloading of movies. These methods of piracy enable the low-cost sale of DVDs, as well as free viewing and sharing of DVDs, both of which compete with rentals and sales by authorized retailers like us. Competition from piracy has increased in recent years, in particular in our international markets, due in part to developments in technology that allow for faster copying and downloading of DVDs. Piracy has had a lesser effect on the video game industry in the United States, but has been a significant hindrance to the development of the home video game industry in many international markets, particularly in Latin America and Asia.

*Other Competition.* We also compete generally for the consumer's entertainment dollar and leisure time with, among others, (i) movie theaters; (ii) Internet browsing, online gaming and other Internet-related activities; (iii) consumers' existing personal movie libraries; (iv) live theater; (v) sporting events; and (vi) music entertainment.

These and other competitive pressures may have a material adverse effect on our business.

# OUR OPERATIONS

## Stores and Store Operations

*Store Operations.* Our U.S. company-operated stores generally operate under substantially similar hours of operation. Domestic stores are generally open 365 days a year, with daily hours from approximately 10:00 a.m. to 12:00 midnight. The hours of operation for franchised stores will vary depending on the franchisee, but generally, franchisees follow the store hours of our company-operated stores. Our U.S. company-operated stores each employs an average of 10 people, including one store manager. Staffing for franchised stores will vary and is the sole responsibility of our franchisees. International store operations vary by country.

*Portfolio Management.* Within each targeted market, we identify potential sites for new and replacement stores by evaluating market dynamics, some of which include population demographics, customer concentration levels and possible competitive factors. We seek to place stores in locations that are convenient and visible to the public. We also seek to locate our stores in geographic areas with population and customer concentrations that enable us to better allocate available resources and manage operating efficiencies in inventory management, advertising, marketing, distribution, training and store supervision. We use our extensive membership transaction and real estate databases to monitor market conditions, select strategic store locations and maximize revenues without significantly decreasing the revenues of our nearby stores. We also periodically examine whether the size and formats of our existing stores are optimal for their location and may adjust the size, relocate or close existing stores as conditions require.

As a result of the declining revenues and anticipated consolidation in the in-store rental industry, we are currently reviewing many of our store leases and selecting sites to close or downsize based on various factors, including proximity to other Blockbuster and competitor locations and profitability. During 2006, these reviews resulted in the closure of more stores than in previous years. We will continue this review process in 2007, but do not anticipate closing as many stores in 2007 as we did in 2006. In addition, we anticipate opening stores at generally the same rate in 2007 as in 2006.

During 2006, we divested 71 stores operating under our Movie Brands Inc. subsidiary and 35 stores operating as MOVIE TRADING CO., closed approximately 93 company-operated stores in Spain and sold 89 company-operated stores in Taiwan, coupled with a master franchise license.

The following table sets forth our store count information for both company-operated and franchised stores, domestic and international, during 2006:

|  | Company-Operated | | | Franchised Stores | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|
|  | U.S. | Int'l. | Total | U.S. | Int'l. | Total | U.S. | Int'l. | Total |
| December 31, 2005(1) | 4,617 | 2,541 | 7,158 | 1,079 | 805 | 1,884 | 5,696 | 3,346 | 9,042 |
| Opened | 17 | 27 | 44 | 10 | 19 | 29 | 27 | 46 | 73 |
| Closed | (358) | (161) | (519) | (90) | (54) | (144) | (448) | (215) | (663) |
| Purchased/sold | (21) | (111) | (132) | (60) | 100 | 40 | (81) | (11) | (92) |
| Net additions/closures | (362) | (245) | (607) | (140) | 65 | (75) | (502) | (180) | (682) |
| December 31, 2006(1) | 4,255 | 2,296 | 6,551 | 939 | 870 | 1,809 | 5,194 | 3,166 | 8,360 |

(1)   These totals do not include sites that are leased or owned which are non-operating.

**Store Locations.** At December 31, 2006, in the United States and its territories, we operated 4,255 stores and our franchisees operated 939 stores. The following table sets forth, by state or territory, the number of domestic stores operated by us and our franchisees as of December 31, 2006.

| STATE OR TERRITORY | Number of Company-Operated Stores | Number of Franchised Stores | Total (1) |
|---|---|---|---|
| Alaska | — | 17 | 17 |
| Alabama | 43 | 32 | 75 |
| Arkansas | — | 18 | 18 |
| Arizona | 125 | 6 | 131 |
| California | 575 | 45 | 620 |
| Colorado | 110 | 4 | 114 |
| Connecticut | 41 | 20 | 61 |
| District of Columbia | 6 | — | 6 |
| Delaware | 7 | 8 | 15 |
| Florida | 366 | 59 | 425 |
| Georgia | 187 | 1 | 188 |
| Guam | 3 | — | 3 |
| Hawaii | 24 | — | 24 |
| Iowa | 23 | 2 | 25 |
| Idaho | 1 | 13 | 14 |
| Illinois | 215 | 4 | 219 |
| Indiana | 71 | 46 | 117 |
| Kansas | 21 | 35 | 56 |
| Kentucky | 37 | 45 | 82 |
| Louisiana | 57 | 31 | 88 |
| Massachusetts | 64 | 56 | 120 |
| Maryland | 98 | 22 | 120 |
| Maine | 6 | — | 6 |
| Michigan | 151 | 1 | 152 |
| Minnesota | 50 | 7 | 57 |
| Missouri | 85 | 13 | 98 |
| Mississippi | 13 | 31 | 44 |
| Montana | — | 8 | 8 |
| North Carolina | 140 | 1 | 141 |
| North Dakota | — | 6 | 6 |
| Nebraska | 28 | 3 | 31 |
| New Hampshire | 15 | 5 | 20 |
| New Jersey | 130 | 23 | 153 |
| New Mexico | — | 33 | 33 |
| Nevada | 46 | 2 | 48 |
| New York | 215 | 9 | 224 |
| Ohio | 173 | 2 | 175 |
| Oklahoma | 62 | 5 | 67 |
| Oregon | 72 | 16 | 88 |
| Pennsylvania | 169 | 6 | 175 |
| Puerto Rico | — | 39 | 39 |
| Rhode Island | — | 23 | 23 |
| South Carolina | 76 | 2 | 78 |
| South Dakota | 0 | 9 | 9 |
| Tennessee | 52 | 57 | 109 |
| Texas | 344 | 114 | 458 |

| STATE OR TERRITORY | Number of Company-Operated Stores | Number of Franchised Stores | Total (1) |
|---|---|---|---|
| Utah | 49 | 2 | 51 |
| Virginia | 99 | 30 | 129 |
| Virgin Islands | — | 2 | 2 |
| Vermont | 8 | 2 | 10 |
| Washington | 119 | 4 | 123 |
| Wisconsin | 66 | 4 | 70 |
| West Virginia | 13 | 6 | 19 |
| Wyoming | — | 10 | 10 |
| Domestic Store Totals | 4,255 | 939 | 5,194 |

(1)  These totals do not include sites that are leased or owned which are non-operating.

At December 31, 2006, outside of the United States, we operated 2,296 stores, including game store-in-store concepts operating under the name GAME RUSH in Canada and Denmark, 203 specialty game stand-alone stores operating under the name GAMESTATION in the United Kingdom and 4 specialty game stand-alone stores operating under the name GAME RUSH in Italy and Mexico. In addition, our franchisees operated 870 stores outside of the United States. The following table sets forth, by country, the number of stores operated by us and by our franchisees as of December 31, 2006.

| COUNTRY | Number of Company-Operated Stores | Number of Franchised Stores | Total (1) |
|---|---|---|---|
| Great Britain | 892 | — | 892 |
| Canada | 449 | — | 449 |
| Australia | 29 | 346 | 375 |
| Mexico | 314 | 5 | 319 |
| Italy | 181 | 65 | 246 |
| Ireland (Republic) and Northern Ireland | 196 | — | 196 |
| Brazil | — | 141 | 141 |
| Taiwan | — | 129 | 129 |
| Argentina | 83 | 1 | 84 |
| Chile | 78 | — | 78 |
| Denmark | 71 | — | 71 |
| New Zealand | — | 40 | 40 |
| Portugal | — | 27 | 27 |
| Thailand | — | 22 | 22 |
| Colombia | — | 22 | 22 |
| Venezuela | — | 20 | 20 |
| Panama | — | 16 | 16 |
| Israel | — | 15 | 15 |
| Guatemala | — | 8 | 8 |
| Spain | — | 8 | 8 |
| El Salvador | — | 5 | 5 |
| Uruguay | 3 | — | 3 |
| International Store Totals | 2,296 | 870 | 3,166 |
| United States | 4,255 | 939 | 5,194 |
| Domestic and International Store Totals | 6,551 | 1,809 | 8,360 |

(1)  These totals do not include sites that are leased or owned which are non-operating.

## Franchised Operations

At December 31, 2006, approximately 197 domestic franchisee entities operated 939 stores in the United States and approximately 274 international franchisee entities operated 870 stores outside of the United States. Our $5.5 billion in revenues during 2006 does not include the actual revenues of our franchisees, as we only record royalty and fee revenues generated from our franchised operations. Under our current U.S. franchising program, we enter into a development agreement and subsequent franchise agreement(s) with the franchisee. Pursuant to the terms of a typical development agreement, we grant the franchisee the right to develop one or a specified number of stores at a permitted location or locations within a defined geographic area and within a specified time. We generally charge the franchisee a development fee at the time of execution of the development agreement for each store to be developed during the term of the development agreement. A development agreement is not, however, typically entered into when a franchisee acquires an existing store from us or another franchisee. The typical franchise agreement is a long-term agreement that governs, among other things, the operations of the store to protect our brand. We generally require the franchisee to pay us a one-time franchise fee and continuing royalty fees, service fees and monthly payments for, among other things, maintenance of our proprietary software. In addition, from time to time we provide optional programs and product and support services to our franchisees for which we occasionally receive fees. We also require our franchisees to contribute funds for national advertising and marketing programs and require that franchisees spend an additional amount for local advertising or other marketing efforts. The amounts our franchisees are required to contribute for national advertising and marketing efforts may change from time to time in order to allow our franchisees to invest in their business. Our international franchising program is similar in many ways to our domestic franchising program. For example, our international franchisees are generally required to pay us a one-time franchise fee and continuing royalty fees and service fees.

Our franchisees have control over all operating and pricing decisions at their respective locations. For example, our franchisees have control over whether or not to eliminate extended viewing fees and the specific rental terms underlying any elimination of extended viewing fees and over whether or not to participate in the BLOCKBUSTER Total Access program. This has resulted in variations of rental terms, selling terms and restocking fees between company-operated and franchised BLOCKBUSTER stores, as well as variations in these terms among franchised BLOCKBUSTER stores. As of February 1, 2007, approximately 130 of our franchise stores in the United States were participating in the "no late fees" program. Many of our franchisees chose not to eliminate extended viewing fees or have returned to charging extended viewing fees due to the fact that they operate under a different business model than we do, whereby they are not able, or choose not, to purchase the additional product to support the "no late fees" program. As of February 1, 2007, substantially all of our franchisees in the United States were participating in the BLOCKBUSTER Total Access program. We also do not require our franchisees to purchase inventory from us. A franchisee has sole responsibility for all financial commitments relating to the development, opening and operation of its stores, including rent, utilities, payroll and other capital and incidental expenses. We cannot offer assurances that our franchisees will be able to achieve profitability levels in their businesses sufficient to pay our franchise fees, as discussed in more detail below under "Item 1A. Risk Factors—Our results of operations could be materially adversely affected if our franchisees failed to pay our franchise fees." Furthermore, we cannot offer assurances that we will be successful in marketing and selling new franchises, that we will continue to actively pursue new franchisees or that any new franchisees will be able to obtain desirable locations and acceptable leases. Finally, we cannot predict the impact that our franchisees' decisions with respect to product depth and pricing may have on our overall business results.

## Marketing and Advertising

We design our marketing and advertising campaigns in order to maximize opportunities in the marketplace and thereby increase the return on our marketing and advertising expenditures. We obtain information from our membership transaction database, our real estate database and outside research agencies to formulate and adjust our marketing and advertising campaigns based on:

- membership behavior and transaction trends;

- consumer needs and attitudes;

- our market share in the relevant market;

- our financial position;

- our evaluation of industry trends;

- local demographics; and

- other competitive issues.

This enables us to focus our resources in areas that we believe will generate the best return on our investment.

During 2006, we continued to focus on offering programs that are an alternative to the programs offered by mass merchant retailers and other online subscription service providers. For example, in the United States, we introduced our BLOCKBUSTER Total Access program in November of 2006. We also continued to offer our Guaranteed in Stock rental program on certain rental titles, our in-store movie and game subscription services – the BLOCKBUSTER Movie Pass® and the BLOCKBUSTER Game Pass® – and our BLOCKBUSTER Rewards® program. Each of these is discussed below.

- *BLOCKBUSTER Total Access.* Under the BLOCKBUSTER Total Access program, online subscribers have the option of exchanging their DVDs through the mail or returning them to a nearby participating BLOCKBUSTER store in exchange for free in-store movie rentals.

- *No Late Fees.* The "no late fees" program eliminates extended viewing fees on movies and games at substantially all of our company-operated BLOCKBUSTER stores in the United States and Canada and at certain participating franchise locations in the United States. The "no late fees" program was launched to eliminate our most prevalent customer complaint with the movie rental experience and to combat our competitors' use of "late fees" as a means of differentiating their service offerings.

- *Guaranteed in Stock.* The Guaranteed in Stock program offers customers the assurance that certain popular newly released video titles will be in stock or the customer will receive a coupon that can be redeemed for a free rental of that movie within the following 30 days.

- *BLOCKBUSTER Movie Pass and BLOCKBUSTER Game Pass.* These in-store programs allow customers to watch or play an unlimited amount of movies or games (the number of movies or games allowed out at a time is dependent on the pass the customer selects) for one monthly price and keep them for whatever period of time that they desire during the term of the pass, subject to certain limitations.

- *BLOCKBUSTER Rewards.* This premium in-store membership program is designed to offer benefits to our customers and enhance customer loyalty by encouraging our customers to rent movies and games only from our stores.

We continued our customer relations management ("CRM") business strategy to build relationships with specific customer segments in order to maintain relevant value across all customer groups and introduce our customers to our new customer proposition initiatives. By segmenting our customer base and targeting our direct marketing channel communications, we believe we are improving the effectiveness and efficiency of our direct marketing efforts in traditional channels such as direct mail and e-mail, as well as non-traditional channels such as voice marketing and point of sale. Specific to our new customer proposition initiatives, we believe our existing capabilities help drive customers to both our in-store and online subscription services. In addition to using our existing CRM systems, we have built and are continuing to build new CRM systems specific to online subscription that will help us understand online consumer behavior in regards to web traffic and rental patterns.

We believe that our CRM activities positively impact our ability to drive incremental store visits, consumer spending and customer retention rates. We are communicating with customers at critical junctions in the

12

"customer lifecycle," and we believe we are driving changes to their activity to enhance our business. Additionally, we continue frequent and consistent relationship-building activities with customers via e-mail and voice marketing, both of which are extremely low-cost communication channels, and by leveraging our direct mail database.

During 2006, our advertising focus was on growing our online rental subscriber base. Our advertising focus during 2007 will primarily be in support of our BLOCKBUSTER Total Access program. For example, we have announced that we anticipate incurring approximately $35 million in national media marketing expenses in addition to our other advertising expenses during the first quarter of 2007 to promote BLOCKBUSTER Total Access, which we believe will benefit both the online and in-store components of our business due to the integrated nature of the program. We also expect to capitalize on our four-year exclusive alliance with The Weinstein Company, which provides us with exclusive U.S. rental rights to The Weinstein Company's theatrical and direct-to-video movies. Meanwhile, we anticipate that the studios will continue their spending to advertise new DVD releases. In addition, some of our business alliances, including some of those with the studios, allow us to direct a portion of their home video advertising expenditures. For example, we often receive cooperative advertising funds from the studios that might be used for direct mail or point-of-purchase advertising.

## Suppliers and Purchasing Arrangements

We purchase our movie rental inventory for our U.S. company-operated stores directly from the studios on both a title-by-title basis through purchase orders and through various "revenue-sharing" arrangements. The number of domestic movie rental inventory units purchased under revenue-sharing arrangements increased during 2006 to approximately 81.8% of our in-store units purchased, up from approximately 71.0% during 2005. Revenue-sharing arrangements for movie rental inventory require us to share an agreed upon percentage of our rental revenues with a studio for a limited period of time. Revenue-sharing arrangements also generally provide for a lower initial payment for product, with the remainder of revenue-sharing product payments becoming due as rental revenues are earned. In addition to the revenue-sharing component, each arrangement also provides for the method of disposition of the product at the conclusion of the rental cycle. The number of domestic game software rental inventory units purchased under revenue-sharing arrangements increased from 43.3% in 2005 to 51.5% in 2006. Revenue-sharing arrangements for rental game software are generally negotiated on a title-by-title basis, but are otherwise similar to our movie arrangements.

Currently, substantially all DVD titles are released at a price to the home video retailer that is low enough to allow for an affordable sales price by the retailer to the consumer from the beginning of the retail home video distribution window. When the home video market shifted towards the sell-through priced DVD format, the overall significance to us of revenue-sharing arrangements generally declined, as the lower sell-through pricing for DVD product enabled us to acquire significant quantities of product with or without revenue-sharing. However, as a result of the success of our elimination of extended viewing fees, our movie and game passes and BLOCKBUSTER Total Access, we increased our use of revenue-sharing arrangements for DVD product beginning in 2005 to improve our product availability to support these programs. Product not returned at the end of the rental and goodwill periods is automatically purchased by the customer and might trigger an additional payment under certain revenue-sharing agreements for the early sale of the product, which increases the cost of the revenue-sharing arrangement. Based on market conditions and economics, we may adjust the use of revenue-sharing arrangements in the future to ensure that our product availability and copy depth are purchased at the most cost effective method for our business.

We currently purchase movie rental inventory for our online rental subscription service both from the studios through revenue-sharing arrangements and from a third-party distributor depending upon various factors such as cost and delivery methods. Based on market conditions and economics, we may adjust how we purchase inventory for our online business to ensure the necessary product availability and copy depth required to effectively provide the 65,000 titles in our online rental library. During 2006, slightly less than half of our online rental inventory units were purchased under revenue-sharing arrangements, which represents an increase from 2005.

In our international markets, more than half of our movie and game rental inventory units are purchased on a title-by-title basis through purchase orders directly from the studios or through sub-wholesalers appointed by the studios to distribute the studios' product in particular countries. The remainder of our international rental product is purchased under revenue-sharing arrangements similar to those discussed above. Our purchasing arrangements vary by country and studio depending on factors such as the availability of the rental window and revenue-sharing terms.

New retail movie and game inventory is purchased from the studios or their designated sub-wholesalers on a title-by-title basis through purchase orders. We also acquire retail movie and game inventory through our trading programs. We purchase general merchandise that is complementary to our rental and retail movie and video game inventory, such as confection, game and other accessories and consumer electronics, from a variety of suppliers on a product-by-product basis through purchase orders.

We require each franchisee to comply with basic guidelines that set forth the minimum amount and selection of movies to be kept in its store inventory. Franchisees typically obtain movies from their own suppliers and are also responsible for obtaining some of the other complementary products from their own suppliers. However, if we have purchased the distribution rights to a movie or if a franchisee participates with us under our revenue-sharing arrangements, the franchisee may obtain the applicable product from us.

**Distribution and Inventory Management**

In the United States, we receive substantially all of our movies and games for our U.S. company-operated stores at our 850,000 square foot distribution center in McKinney, Texas. The distribution center is a highly automated, centralized facility that we use to mechanically repackage newly-released movies and games to make them suitable for rental at our stores. We also use our distribution center to restock products and process returns, as well as to provide some office space. We use a network of third-party delivery agents for delivery of products to our U.S. stores. We ship our products to these delivery agents, located strategically throughout the United States, which in turn deliver them to our stores.

We believe our distribution center gives us a significant advantage over some of our competitors that primarily use third-party distributors because we are able to process and distribute a greater quantity of products while reducing costs and improving services to our stores. The distribution center supports substantially all of our company-operated stores in the United States and operates 24 hours a day, six days a week. As of December 31, 2006, we employed about 800 employees at our distribution center.

In addition to our distribution center in McKinney, we also have 35 distribution centers spread strategically throughout the United States to support our online subscription service. These online distribution centers are spread across the country because we use the United States Postal Service to distribute our online product, and the closer the distribution center is to a customer, the faster the customer receives the product. Additionally, to expedite the delivery of product to our online customers, we currently transport product from our 35 distribution centers to a total of approximately 90 different mail entry points, which enables us to reach over 90% of our online subscriber base within one business day. We also utilize our store base to fulfill a portion of our online orders. We plan to add at least 5 new distribution centers in 2007, which will provide us with more than 100 total mail entry points across the country.

Franchisees generally obtain their products directly from third-party suppliers, except for their point-of-sale systems' hardware and software, some accessories and supplies, movies for which we have exclusive distribution rights and movies for franchisees that participate in our franchisee revenue-sharing programs, which domestic franchisees receive from our distribution center.

In our international markets, our stores generally receive rental product directly from the studios or sub-wholesalers. Retail product is generally distributed through a central warehouse for the market or through a third-party distributor.

## Management Information Systems

We believe that the accurate and efficient management of purchasing, inventory and sales records is important to our future success. We maintain information, updated daily, regarding revenues, current and historical sales and rental activity, demographics of store customers and rental patterns. This information can be organized by store, market, region, state, country or for all operations.

All of our Blockbuster branded company-operated stores use our point-of-sale system. Our national point-of-sale system in the United States is linked with a data center located in our distribution center. The point-of-sale system tracks all of our products distributed from the distribution center to each U.S. store using scanned bar code information. All domestic rental and sales transactions are recorded by the point-of-sale system when scanned at the time of customer checkout. At the end of each day, the point-of-sale system transmits store data from operations to the data center and the membership transaction database.

Our online services use internally developed software that focus on optimizing our online supply chain to ensure timely delivery of products and providing a user-friendly website experience. These systems transmit data from operations to a data center and other systems which support, among other things, content delivery, customer web analytics and offer management.

During 2006, we enhanced our enterprise resource planning system, upgraded our corporate productivity tools, adopted new collaboration technology and began a national point-of-sale customer payment system upgrade. In addition, we re-launched our website to provide a more modern look and feel, improved navigation, advanced user functions and more flexibility and scalability of the information obtained. In conjunction with the launch of BLOCKBUSTER Total Access, we implemented systems that allow us to exchange online fulfilled rental product for store rental product and introduced laptops and cellular internet access at our U.S. stores to allow for in-store sign-ups for online subscribers.

## Regulation

### *Domestic Regulation*

We are subject to various federal, state and local laws that govern the access to and use of our video stores by disabled customers and the disclosure, retention and security of customer records and information, including laws pertaining to the use of our membership transaction database. We also must comply with various regulations affecting our business, including federal, state or local securities, advertising, consumer protection, credit protection, franchising, licensing, zoning, land use, construction, second-hand dealer, environmental, health and safety, minimum wage, labor and employment, trading activities and other regulations.

We are also subject to the Federal Trade Commission's Trade Regulation Rule entitled "Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures" and state laws and regulations that govern the offer and sale of franchises and franchise relationships. If we want to offer and sell a franchise, we are required to furnish to each prospective franchisee a current franchise offering circular prior to the offer or sale of a franchise. In addition, a number of states require us to comply with registration or filing requirements prior to offering or selling a franchise in the state and to provide a prospective franchisee with a current franchise offering circular complying with the state's laws, prior to the offer or sale of the franchise. We intend to maintain a franchise offering circular that complies with all applicable federal and state franchise sales and other applicable laws. However, if we are unable to comply with federal franchise sales and disclosure laws and regulations, we will be unable to offer and sell franchises anywhere in the United States. In addition, if we are unable to comply with the franchise sales and disclosure laws and regulations of any state that regulate the offer and sale of franchises, we will be unable to offer and sell franchises in that state.

We are also subject to a number of state laws and regulations that regulate some substantive aspects of the franchisor-franchisee relationship, including:

- those governing the termination or non-renewal of a franchise agreement, such as requirements that:

    (a) "good cause" exist as a basis for such termination; and

    (b) a franchisee be given advance notice of, and a right to cure, a default prior to termination;

- requirements that the franchisor deal with its franchisees in good faith;

- prohibitions against interference with the right of free association among franchisees; and

- those regulating discrimination among franchisees in charges, royalties or fees.

### International Regulation

We are subject to various international laws that govern the disclosure, retention and security of customer records and information. For example, the laws pertaining to the use of our membership transaction database in some markets outside of the United States are more restrictive than the relevant laws in the United States and may restrict data flow across international borders.

We must also comply with various other international regulations affecting our business, including advertising, consumer protection, access to and use of our video stores by disabled customers, credit protection, film and game classification, franchising, licensing, zoning, land use, construction, second-hand dealer, environmental, health and safety, minimum wage and other labor and employment regulations. Some foreign countries have copyright and other intellectual property laws that differ from the laws of the United States. These laws may prevent or limit certain types of business activity in the affected markets.

Similar to the United States, some foreign countries have franchise registration and disclosure laws affecting the offer and sale of franchises within their borders and to their citizens. They are often not as extensive and onerous as U.S. laws and regulations. However, as in the United States, failure to comply with such laws could limit or preclude our ability to expand in those countries through franchising or could affect the enforceability of franchise agreements.

Compliance with any of the domestic or international regulations discussed above is costly and time-consuming, and we may encounter difficulties, delays or significant costs in connection with such compliance.

## Historical Information

Our business and operations were previously conducted by Blockbuster Entertainment Corporation, which was incorporated in Delaware in 1982 and entered the movie rental business in 1985. Blockbuster Inc., formerly an indirect subsidiary of Viacom Inc. ("Viacom") was incorporated under a different name on October 16, 1989 in Delaware. On September 29, 1994, Blockbuster Entertainment Corporation was merged with and into Viacom. Subsequent to the merger, our business and operations were conducted by various indirect subsidiaries of Viacom. Over the year and a half prior to our initial public offering in August 1999, our business and operations were either (1) merged into Blockbuster Inc. or (2) purchased by Blockbuster Inc. and/or one of its subsidiaries. In October 2004, Blockbuster Inc. split-off from Viacom and became a fully independent company.

## Intellectual Property

*Trademarks.* We own various existing trademark registrations and have trademark applications pending registration with respect to our services and products offered worldwide. These include BLOCKBUSTER®, BLOCKBUSTER VIDEO®, TORN TICKET Logos, blockbuster.com®, BLOCKBUSTER Total Access™ word

mark and logo, BLOCKBUSTER Online®, BLOCKBUSTER Night®, BLOCKBUSTER GiftCard/s®, BLOCKBUSTER Game Pass® and BLOCKBUSTER Movie Pass® word marks and logos, BLOCKBUSTER Rewards® word mark and logo and the related BLOCKBUSTER Family of Marks, GAME RUSH® word mark and logo, ONLINE RENTING WITHOUT THE WAIT™, MyQ™, MyQ Logo®, MyQ At A Glance Logo®, LIFE AFTER LATE FEES®, THE MOVIE STORE AT YOUR DOOR®, RENTING IS BETTER THAN EVER®, THE GIFT OF ENTERTAINMENT®, MAKE IT A BLOCKBUSTER NIGHT®, QUIK DROP®, GAMESTATION® and XTRA-VISION®, among others, and trade dress elements including the blue and yellow awning outside our stores. In addition, we own the domain name registration for "blockbuster.com" and various "blockbuster" top level and country domain names, and a wide variety of other domain name registrations worldwide. We consider our intellectual property rights to be among our most valuable assets.

*Copyrights.* In addition to our own intellectual property rights, the scope of the rights of those who own copyrights in the products we rent also are of importance to us. The copyright "first sale" doctrine provides that, in the United States, the owner of a legitimate copy of a copyrighted work may, without the consent of the copyright owner, sell, rent or otherwise transfer possession of that copy. The first sale doctrine does not apply to sound recordings or computer software (other than software made for a limited purpose computer, such as a video game platform) for which the U.S. Copyright Act vests the right to control the rental of the copy in the copyright holder. The first sale doctrine does not exist in most countries outside of the United States where the copyright owner retains the rental rights to a copyrighted work. In these countries, home video retailers must obtain the right to rent videos to consumers through a licensing arrangement or a "purchase-with-the-right-to-rent" arrangement. Studios may charge these home video retailers more for product purchased for rental than product purchased solely for sale to consumers. This is commonly referred to as "two-tiered pricing" and is discussed further above under "—Industry Overview—International Home Video Industry—In-Home Movies." The potential impact of studio pricing decisions in countries where two-tiered pricing is allowed is discussed under "Item 1A. Risk Factors—Changes in studio pricing policies have resulted in increased competition, in particular from mass merchant retailers, which has impacted consumer rental and purchasing behavior. We cannot control or predict future studio decisions or resulting consumer behavior, and future changes could negatively impact our profitability." The risk of changes in U.S. and international copyright laws is discussed under "Item 1A. Risk Factors—We are subject to governmental regulation particular to the retail home video industry and changes in U.S. or international laws may adversely affect us."

## Seasonality

There is a distinct seasonal pattern to the home video and video games business, with slower business in April and May, due in part to improved weather and Daylight Saving Time, and in September and October, due in part to the start of school and the introduction of new television programs. The months of November and December have historically been our highest revenue months. While we expect these months to continue to make the largest contributions to our rental revenues, we believe the strength of rental revenues in these months has been and will continue to be negatively affected, to some degree, by consumers purchasing DVDs during the holiday season. Additionally, while our online and in-store rental subscription offerings have helped us mitigate, to some extent, the impact of seasonality and weather conditions on our business by providing a more steady revenue stream across all months, seasonality and weather are expected to continue to impact our business and our period-to-period financial results in the future.

## Employees

As of December 31, 2006, we employed about 67,300 persons, including about 46,800 within the United States and about 20,500 outside of the United States. Of the total number of U.S. employees, about 13,100 were full-time, about 31,900 were part-time and about 1,800 were seasonal employees. We believe that our employee relations are good.

17

**Directors and Executive Officers of the Registrant**

The following information regarding our directors and executive officers is as of February 1, 2007.

| Name | Age | Position |
|---|---|---|
| John F. Antioco | 57 | Chairman of the Board of Directors and Chief Executive Officer |
| Edward Bleier | 77 | Director |
| Robert A. Bowman | 51 | Director |
| Jackie M. Clegg | 44 | Director |
| James W. Crystal | 69 | Director |
| Gary J. Fernandes | 63 | Director |
| Jules Haimovitz | 56 | Director |
| Carl C. Icahn | 70 | Director |
| Strauss Zelnick | 49 | Director |
| Frank G. Paci | 49 | Executive Vice President, Strategic Planning and Business Development |
| Nicholas P. Shepherd | 48 | Executive Vice President and President, Worldwide Stores |
| Larry J. Zine | 52 | Executive Vice President, Chief Financial Officer and Chief Administrative Officer |

Set forth below is a description of the background of each of our directors and executive officers.

*John F. Antioco* has served as our Chairman of the Board of Directors and Chief Executive Officer since 1997 and served as our President from 1997 until 2001. Mr. Antioco is a member of the board of governors of the Boys & Girls Clubs of America.

*Edward Bleier* was elected as a director of Blockbuster in May 2005. Mr. Bleier was with Warner Bros. Entertainment Inc., New York, New York, from October 1969 to January 2005, where he served, partly, as President of Domestic Pay-TV, Cable and Networks Features, encompassing feature films, TV programming, animation, network sales, video-on-demand and consumer marketing. Mr. Bleier is a member of the board of directors of RealNetworks, Inc. and CKX, Inc. He is also Chairman Emeritus of the Center for Communication and the Academy of the Arts Guild Hall, serves as a trustee of the Charles A. Dana Foundation and The Bleier Center for Television and Popular Culture at Syracuse University and is a member of the Council on Foreign Relations. He also authored the 2003 New York Times bestseller "The Thanksgiving Ceremony."

*Robert A. Bowman* was appointed as a director of Blockbuster in December 2004. He has served as President and CEO of Major League Baseball Advanced Media LP, the interactive media and internet company of Major League Baseball, since 2000. Mr. Bowman serves as President of the Michigan Education Trust and is a member of the board of directors of World Wrestling Entertainment Inc. and Warnaco Group Inc.

*Jackie M. Clegg* was appointed as a director of Blockbuster in July 2003. She serves as Managing Partner of Clegg International Consultants, LLC, an international strategic consulting firm she founded in September 2001. In July 2001, Ms. Clegg stepped down as Vice Chairman and First Vice President of the Export-Import Bank of the United States, financier to foreign buyers of U.S. goods and services, after serving in that role since June 1997. She also served as its Chief Operating Officer from January 1999 through fiscal year 2000. Ms. Clegg also serves on the board of directors and audit committees of CBOT Holdings Inc. (Chicago Board of Trade) (chair), Brookdale Senior Living Inc., Cardiome Pharma Corp. and Javelin Pharmaceuticals Inc. (chair). In accordance with the listing standards of the NYSE, Blockbuster's Board of Directors has determined that Ms. Clegg's simultaneous service on Blockbuster's Audit Committee and on the audit committees of the foregoing public companies does not impair Ms. Clegg's ability to effectively serve on Blockbuster's Audit Committee.

*James W. Crystal* was appointed as a director of Blockbuster in February 2007. Mr. Crystal currently serves as Chairman and Chief Executive Officer of Frank Crystal & Company, a privately owned insurance brokerage firm. Mr. Crystal also serves as Vice Chairman, trustee and member of the executive committee and

Co-Chairman of the audit committee of Mt. Sinai Medical Center as well as a trustee of Congregation Emanu-El. In addition, he serves on the board of directors of Stewart & Stevenson LLC, Banco de Caribe, ENNIA Caribe Holding, N.V., Uni-Alliance Insurance in Cyprus, Auto Resources, Inc. in Beverly Hills, and Atlantic International Insurance Co., Ltd., located in Bermuda.

*Gary J. Fernandes* was appointed as a director of Blockbuster in December 2004. He has served as Chairman of FLF Investments, a family business involved with the acquisition and management of commercial real estate properties and other assets, since 1999. Since his retirement as Vice Chairman from Electronic Data Systems Corporation in 1998, he founded Convergent Partners, a venture capital fund focusing on buyouts of technology enabled companies. In addition, from 2000 to 2001, Mr. Fernandes served as Chairman and CEO of GroceryWorks.com, an internet grocery fulfillment company. In November 1998, he founded Voyagers The Travel Store Holdings, Inc., a chain of travel agencies, and was President and sole shareholder of Voyagers. Voyagers filed a petition under Chapter 7 of the federal bankruptcy laws in October 2001. Mr. Fernandes serves on the board of directors of BancTec, Inc. and Computer Associates International, Inc. He is also a member of the board of governors of the Boys & Girls Clubs of America and serves as a trustee for the O'Hara Trust and the Hall-Voyer Foundation.

*Jules Haimovitz* was appointed as a director of Blockbuster in May 2006. Since July 2002, Mr. Haimovitz has served as Vice Chairman and Managing Partner of Dick Clark Productions Inc., a producer of programming for television, cable networks and syndicators. From June 1999 to July 2004, Mr. Haimovitz served in various capacities at Metro Goldwyn Mayer Inc., including President of MGM Networks Inc., a wholly-owned subsidiary, Executive Consultant to the CEO, and Chair of the Library Task Force. From July 1997 to February 1999, he served as President and Chief Operating Officer of King World Productions, Inc., a worldwide distributor of first-run programming. Mr. Haimovitz has also served in executive positions at Diva Systems Corporation, ITC Entertainment Group, Spelling Entertainment Inc. and Viacom Inc. Mr. Haimovitz is on the board of directors of Infospace, Inc., TVN Entertainment Corporation and GNet Productions.

*Carl C. Icahn* was elected as a director of Blockbuster in May 2005. Mr. Icahn has served as Chairman of the Board and a director of Starfire Holding Corporation and Chairman of the Board and a director of various subsidiaries of Starfire, since 1984. Since February 2005, Mr. Icahn has served as a director of CCI Onshore Corp. and CCI Offshore Corp., which are in the business of managing private investment funds, and from September 2004 to February 2005, Mr. Icahn served as the sole member of their predecessors, CCI Onshore LLC and CCI Offshore LLC, respectively. Mr. Icahn was also Chairman of the Board and President of Icahn & Co., Inc., a registered broker-dealer and a member of the National Association of Securities Dealers, from 1968 to 2005. Since 1994, Mr. Icahn has been the principal beneficial stockholder of American Railcar Industries, Inc., currently a publicly-traded company that is primarily engaged in the business of manufacturing covered hopper and tank railcars, and has served as Chairman of the Board and as a director of American Railcar Industries, Inc., since 1994. Since November 1990, Mr. Icahn has been Chairman of the Board of American Property Investors, Inc., the general partner of American Real Estate Partners, L.P., a public limited partnership controlled by Mr. Icahn that invests in real estate and holds various other interests, including the interests in its subsidiaries that are engaged, among other things, in the casino entertainment business and the home textile business. From October 1998 through May 2004, Mr. Icahn was the President and a director of Stratosphere Corporation, which operates the Stratosphere Hotel and Casino. Mr. Icahn has been Chairman of the Board and a director of XO Holdings, Inc. since February 2006, and was Chairman of the Board and a director of XO Communications, Inc. (XO Holdings' predecessor) from January 2003 to February 2006. XO Holdings is a publicly-traded telecommunications services provider controlled by Mr. Icahn. In September 2006, Mr. Icahn became a director of ImClone Systems Incorporated, a publicly-traded biopharmaceutical company, and since October 2006, has been the Chairman of the Board of ImClone Systems Incorporated. Mr. Icahn has been a director of Cadus Corporation, a firm that holds various biotechnology patents, since 1993.

*Strauss Zelnick* was elected as a director of Blockbuster in May 2005. Mr. Zelnick founded ZelnickMedia LLC, an investment and advisory firm specializing in media and entertainment, in 2001. ZelnickMedia holds

interests in an array of media enterprises, providing general management and strategic advisory services in the United States, Canada, Europe, Asia and Australia. From 1998 to 2000, Mr. Zelnick served as President and Chief Executive Officer of BMG Entertainment, Inc., a music and entertainment unit of Bertelsmann A.G. Mr. Zelnick served as President and Chief Executive Officer of BMG's North American business unit from 1994 through 1998. Mr. Zelnick is Chairman of the Board of CME, Inc., Direct Holdings Worldwide, Inc. and OTX, Inc. Mr. Zelnick is a director of Carver Bancorp, Inc., Reed Elsevier PLC, Reed Elsevier N.V. and Reed Elsevier Group plc.

Frank G. Paci has served as our Executive Vice President, Strategic Planning and Business Development since February 2006 and served as our Executive Vice President, Finance and Accounting, Strategic Planning and Development from January 2005 until February 2006. He served as our Executive Vice President, Finance, Strategic Planning and Development from 2003 to 2005 and as Senior Vice President, Strategic Planning and Finance Operations from 2001 to 2003. Mr. Paci also served as our Senior Vice President, Strategy and Planning from 2000 to 2001 and Senior Vice President International Finance and Worldwide Mergers and Acquisitions from April 2000 until October 2000. Mr. Paci served as Senior Vice President of International Finance and Administration from 1999 to 2000.

Nicholas P. Shepherd has served as our Executive Vice President and President, Worldwide Stores since February 2007. He served as our Executive Vice President and President, Blockbuster North America from May 2005 to February 2007 and served as our Executive Vice President and President, U.S. Store Operations from November 2004 until May 2005. He also served as our Executive Vice President, Chief Marketing and Merchandising Officer from 2003 until 2004 and as our Executive Vice President, Merchandising and Chief Concept Officer from 2001 until 2003. Mr. Shepherd also served as our Senior Vice President and Chief Concept Officer from April 2001 until September 2001. From 1998 until 2001, Mr. Shepherd served as our Senior Vice President, International.

Larry J. Zine has served as our Executive Vice President and Chief Financial Officer since 1999 and as our Chief Administrative Officer since September 2001. Mr. Zine currently serves as a director of Petro Stopping Centers, L.P.

**Available Information, Investor Relations and Certifications**

We file annual, quarterly and current reports, information statements and other information with the Securities and Exchange Commission ("SEC"). The public may read and copy any materials we file with the SEC at the SEC's Public Reference Room at 100 F Street, N.E., Washington, D.C. 20549. The public may obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. The SEC also maintains an Internet site that contains reports, proxy and information statements, and other information regarding issuers that file electronically with the SEC. The address of that site is http://www.sec.gov.

The address of our Internet website is www.blockbuster.com, and the Investor Relations section of Blockbuster's website may be accessed directly at http://investor.blockbuster.com. Through links on the Investor Relations portion of our website, we make available free of charge our annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and any amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended. Such material is made available through our website as soon as reasonably practicable after we electronically file the material with, or furnish it to, the SEC. The information contained on our website does not constitute part of this annual report on Form 10-K.

*Stock Transfer Agency*

Computershare Trust Company, N.A.
P.O. Box 43078
Providence, RI 02940-3078
Questions and inquiries via telephone or Computershare's website:
(877) 282-1168
http://www.computershare.com

*Independent Registered Public Accounting Firm*

PricewaterhouseCoopers LLP
2001 Ross Avenue
Suite 1800
Dallas, TX 75201

*Stock Listing*

Blockbuster Inc. Class A and Class B common stock trades on the New York Stock Exchange under the symbols BBI and BBI.B, respectively.

*Certifications*

We have submitted to the New York Stock Exchange the certification of our Chief Executive Officer, dated as of June 1, 2006, as required by Section 303A.12(a) of the New York Stock Exchange Listed Company Manual.

We have filed with the SEC the certifications of our Chief Executive Officer and our Chief Financial Officer required under Section 302 of the Sarbanes-Oxley Act of 2002 with respect to this Annual Report on Form 10-K. The certifications are attached hereto as Exhibits 31.1 and 31.2.

**Item 1A.   *Risk Factors***

*In addition to the information set forth elsewhere in this report, including under Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations," the factors described below should be considered carefully in making any investment decisions with respect to our securities. These factors could materially affect our business, financial condition, results of operations or liquidity and cause investors in our securities to lose part or all of their investments.*

*Changes in studio pricing policies have resulted in increased competition, in particular from mass merchant retailers, which has impacted consumer rental and purchasing behavior. We cannot control or predict future studio decisions or resulting consumer behavior, and future changes could negatively impact our profitability.*

We operate in the highly competitive home video industry, which includes in-home movie entertainment offered through the retail home video industry, the cable industry, the satellite industry and via digital distribution over the Internet. Of those distribution channels, the retail home video industry includes the sale and rental of movies on DVD and VHS by:

- traditional video store retailers such as Blockbuster and Movie Gallery;

- online retailers such as Blockbuster and Netflix; and

- other retailers, including mass merchant retailers such as Wal-Mart, Best Buy and Target.

21

The studios' current practice is generally to sequentially release their movies to different distribution channels. After the initial theatrical release of a movie, studios generally make their movies available to home video retailers (for rental and retail, including by mass merchant retailers) for a specified period of time. This distribution channel is typically exclusive against other forms of non-theatrical movie distribution, including cable and satellite distribution, and is commonly referred to as the home video retailer's "distribution window." This practice could change at any time, which would negatively impact our business.

Recently, there has been increasing experimentation by studios and various movie content aggregators and retailers with the traditional distribution windows, including simultaneous video-on-demand and DVD releases. For example, although movie selections tend to be limited at present, consumers can now download to their computers certain available movies on the same day that the movie's DVD is released by the studios nationwide in retail stores for rental or sale, and, in some cases, consumers can also burn the downloaded movie to a blank DVD for playback in a DVD player, allowing them to watch the movies on their TVs or portable devices. We expect that the movie studios will continue to assess the traditional release windows and it is possible that the studios may decide to alter the traditional home video retailer distribution window for an increasing number of movies, particularly in connection with simultaneous video-on-demand distribution of movies and DVD release dates.

Historically, at the beginning of a particular movie title's distribution window, the movie would be priced to home video retailers based on the applicable studio's decision to promote the movie to the consumer either primarily for rental, or for both rental and sale, at the beginning of the distribution window. In order to promote a movie title primarily for rental at the beginning of the distribution window, a studio would initially release the title to home video retailers at a price that was too high to enable them to sell the title to consumers at an affordable price. As rental demand subsided, the studio would reduce the pricing for the movie, which would then enable retailers to sell the title to consumers at an affordable price. The time during which the studios released the title at the higher pricing was commonly referred to as the "rental window." Currently, substantially all DVD titles are initially released to home video retailers at a price that is low enough to allow them to offer movies at affordable prices to the consumer from the beginning of the home video retailer's distribution window. This method of pricing is commonly referred to as "sell-through" pricing, and has improved our ability to purchase rental product at lower prices. However, the studios' sell-through pricing policy has also led to increasing competition from other retailers, in particular mass merchants such as Wal-Mart, Best Buy and Target. It has also led to increased competition from online retailers. These other retailers are able, due to the lower sell-through prices, to purchase DVDs for sale to consumers at the same time as traditional home video retailers, who, like us, purchase product for rental. In addition, some retailers lower their sales prices in order to increase overall traffic to their stores or businesses, and mass merchants may be more willing to sell at lower, or even below wholesale, prices to drive traffic and thereby increase sales of their other inventory items. All of these factors have increased consumer interest in purchasing DVDs, which has resulted in increased competition and reduced the significance of the historical rental window.

We believe that the increased consumer purchases of movies have been due in part to consumer interest in building DVD libraries of classic movies and personal favorites and that the studios will remain dependent on traditional home video retailers to generate revenues for the studios from titles that are not classics or current box office hits. We therefore believe the importance of the video rental industry to the studios will continue to be a factor in studio pricing decisions. However, we cannot control or predict studio pricing policies with certainty, and we cannot assure you that consumers will not, as a result of further decreases in studio sell-through pricing and/or sustained or further depressed pricing by competitors, increasingly desire to purchase rather than rent movies. Personal DVD libraries could also cause consumers to rent or purchase fewer movies in the future. Our profitability could, therefore, be negatively affected further if, in light of any such consumer behavior, we were unable to (i) maintain or increase our rental business; (ii) replace gross profits from generally higher-margin rentals with gross profits from increased sales of generally lower-margin sell-through product; or (iii) otherwise positively affect gross profits, such as through price increases or cost reductions. Our ability to achieve one or more of these objectives is subject to risks, including the risk that we may not be able to compete effectively with

other DVD retailers, some of whom may have competitive advantages such as the pricing flexibility described above or favorable consumer perceptions regarding value.

Our profitability is also dependent on our ability to enter into arrangements with the studios that effectively balance cost considerations and the number of copies of a title stocked by us. Each type of arrangement provides different advantages and challenges for us. For example, we have benefited from sell-through pricing of DVDs because the lower cost associated with DVD product has resulted in higher rental margins than product purchased under our historical VHS revenue-sharing arrangements. Our profitability could be negatively affected if studios were to make other changes in their pricing policies, which could include changes in revenue-sharing arrangements, pricing or rental windows for DVDs or expanded exploitation by studios of international two-tiered pricing laws, which allow studios to charge different prices for movies intended for rental to consumers, as opposed to sale. In addition, we cannot predict what use the studios might make of current or future alternative supply methods, such as downloading to stores or consumers, or what impact the use of such supply chain changes by us or our competitors might have on our profitability.

***Our business would lose a competitive advantage if the movie studios were to shorten or eliminate the home video retailer distribution window or otherwise adversely change their current practices with respect to the timing of the release of movies to the various distribution channels.***

A competitive advantage that home video retailers currently enjoy over most other movie distribution channels, except theatrical release, is the early timing of the home video retailer's distribution window. As noted above, after the initial theatrical release of a movie, the studios' current practice is to generally make their movies available to home video retailers (for rental and retail, including by mass merchant retailers) for specified periods of time. This distribution window has traditionally been exclusive against most other forms of non-theatrical movie distribution, such as pay-per-view, video-on-demand, premium television, basic cable, and network and syndicated television. The length of this exclusive distribution window for home video retailers varies, but since the mid-1990's, has averaged between 39 and 56 days for domestic home video retailers. Thereafter, movies are made sequentially available to television distribution channels. The studios' traditional practices with respect to the distribution windows could change at any time.

Our business could be negatively affected if:

- the home video retailer distribution windows were no longer the first following the theatrical release;
- the length of the home video retailer distribution windows were shortened; or
- the home video retailer distribution windows were no longer as exclusive as they are now.

This is because newly released movies would be made available earlier on these other forms of non-theatrical movie distribution, and consumers might no longer need to wait until after the home video retailer distribution window to view a newly released movie on one or more of these other distribution channels. In such event, we would need to address additional competition. According to industry statistics, more movies are now being released to pay-per-view at the shorter end of the home video retailer distribution window range than at the longer end. In addition, many of the major movie studios have entered into various ventures to provide video-on-demand or similar services of their own. Increased studio participation in or support of these types of services could impact their decisions with respect to the timing and exclusivity of the home video retailer distribution window.

Recently, there has been increasing experimentation by studios and various movie content aggregators and retailers with the traditional distribution windows, including simultaneous video-on-demand and DVD releases. For example, although movie selections tend to be limited at present, consumers can now download to their computers certain available movies on the same day that the movie's DVD is released by the studios nationwide in retail stores for rental or sale, and, in some cases, consumers can also burn the downloaded movie to a blank

DVD for playback in a DVD player, allowing them to watch the movies on their TVs or portable devices. We expect that the movie studios will continue to assess the traditional release windows and it is possible that the studios may decide to alter the traditional home video retailer distribution window for an increasing number of movies, particularly in connection with simultaneous video-on-demand distribution of movies and DVD release dates.

We believe that the studios have a significant interest in maintaining a viable home video retail industry. However, because the order, length and exclusivity of each window for each distribution channel is determined solely by the studio releasing the movie, we cannot predict the impact, if any, of any future decisions by the studios. In addition, any consolidation or vertical integration of media companies to include both content providers and digital distributors could pose a risk to the continuation of the home video retailer distribution window.

*We cannot predict the impact that the following may have on our business: (i) new or improved technologies or video formats, (ii) alternative methods of content delivery or (iii) changes in consumer behavior facilitated by these technologies or formats and alternative methods of content delivery. We also compete generally for the consumer's entertainment dollar and leisure time.*

Advances in technologies such as video-on-demand, new video formats, downloading or alternative methods of content delivery or certain changes in consumer behavior driven by these or other technologies and methods of delivery could have a negative effect on our business. In particular, our business could be adversely impacted if:

- newly released movies were to be made widely available by the studios to these technologies or these formats at the same time or before they are made available to home video retailers for rental; and

- these technologies or new formats were to be widely accepted by consumers.

**The widespread availability of additional channels on satellite and digital cable systems may significantly reduce public demand for our products.** Advances in direct broadcast satellite and cable technologies may also adversely affect consumer demand for video store rentals and sales. Direct broadcast satellite providers transmit numerous channels of programs by satellite transmission into subscribers' homes. In addition, cable providers are taking advantage of digital technology to transmit many additional channels of television programs over cable lines to subscribers' homes. Because of their increased availability of channels, direct broadcast satellite and digital cable providers have been able to enhance their pay-per-view businesses by:

- substantially increasing the number and variety of movies they can offer their subscribers on a pay-per-view basis; and

- providing more frequent and convenient start times for the most popular movies.

In addition, pay-per-view allows the consumer to avoid trips to the video store for rentals and returns of movies. However, newly released movies are currently made available by the studios for rental prior to being made available on a pay-per-view basis. In addition, pay-per-view does not currently provide the same start, stop and rewind capabilities as DVD or video. If, however, direct broadcast satellite and digital cable services, including enhanced pay-per-view services, were to become more widely available and accepted, this could have a negative effect on our video store business. This is because a smaller number of movies may be rented or sold if viewers were to favor the expanded number of conventional channels and expanded content, including movies, specialty programming and sporting events, offered through these services. Additionally, increases in the size of the pay-per-view market could lead to an earlier distribution window for movies on pay-per-view if the studios were to perceive this to be a better way to maximize their revenues.

**The availability of content through personal video recorders, video-on-demand and other technologies may significantly reduce the demand for our products or otherwise negatively affect our business.** Any method for delivery of entertainment content that serves as an alternative to obtaining product or services from

24

our stores or our online DVD rental service can impact our business. Examples of delivery methods that have impacted, or could impact, our business are personal video recorders, video-on-demand, download-to-burn DVDs, video vending machines and download-to-burn kiosks, video downloads to portable devices and personal computers and disposable DVDs. These examples and related discussions below do not provide a complete discussion of all alternative methods for delivering entertainment content. Moreover, technology and consumer offerings continue to develop and we expect that new or enhanced technologies and consumer offerings will be available in the future.

*Personal video recorders*. Personal video recorders allow consumers to automatically and digitally record programs to create a customized television line-up for viewing at any time. They also enable consumers to pause, rewind, fast forward, instant replay and playback in slow motion any live television broadcast and are increasingly being used to download movies. Personal movie libraries and other television entertainment recorded via personal video recorders have caused and could continue to cause consumers to rent or purchase fewer movies in the future.

*Video-on-demand*. Many digital cable providers, Internet content providers and other companies provide video-on-demand, including on a subscription basis, which transmits movies and other entertainment content on demand with interactive capabilities such as start, stop and rewind. In addition to being available from most major cable providers, video-on-demand is also offered to consumers over the Internet, as high-speed Internet access has greatly increased the speed and quality of viewing content, including feature-length movies, on personal computers. Consumers can now download to their personal computers certain available movies, and, in some cases, they can download movies on the same day that the movie's DVD is released by the studios nationwide in retail stores for rental or sale. Some Internet sites also offer consumers the ability to burn certain downloaded movies to a blank DVD for playback in a DVD player, allowing them to watch those movies on their TVs or portable devices. Video-on-demand is also currently offered through set-top boxes to which available downloaded movies are delivered. We have, from time to time, tested an entertainment-on-demand service, which delivered video-on-demand to consumers' television sets via digital subscriber lines and fiber optic connections, and we may conduct similar tests from time to time. We also expect to offer our own digital delivery service sometime this year. The future of video-on-demand services, including any services provided by us, is uncertain. Video-on-demand could have a negative effect on our video store business if:

- a wide selection of movies, including newly released movies, is made available at the same time, or before, those titles are made available to the home video retailers for rental and sale,

- video-on-demand technology becomes widely accepted by consumers, and

- video-on-demand is provided at a reasonable price to the customer.

As discussed above, we expect that the movie studios will continue to assess the traditional release windows and it is possible that the studios may decide to alter the traditional home video retailer distribution window for an increasing number of movies, particularly in connection with simultaneous video-on-demand distribution of movies and DVD release dates.

*Download-to-Burn DVDs*. In addition to the ability to pay for and download movies and other entertainment content via the Internet, some Internet sites offer consumers the ability to burn certain available downloaded movies and content to a blank DVD for playback in a DVD player, allowing them to watch those movies on their TVs or portable devices. If the studios license a wide selection of content for download-to-burn in this manner or decide to offer product through this channel themselves, consumers might rent or buy fewer movies via the traditional in-store or online channels in the future, and our business would be negatively impacted.

*Video Vending Machines and Download-to-Burn Kiosks*. A number of retailers, including supermarkets, pharmacies, convenience stores and fast food restaurants, rent DVDs from vending machines located on their premises at discounts to more traditional video rental prices. Any time movies or games are offered to consumers

25

at a deeply discounted price, we view this as competition for our customers' entertainment dollars. In addition, as video-on-demand technology continues to improve, download-to-burn kiosks at mass merchant retail stores, supermarkets, pharmacies, convenience stores and other retailers may also provide a source of competition for the delivery of movie and entertainment content. We cannot predict (i) how broad the selection of movies offered via video vending machines or download-to-burn kiosks may become; (ii) consumer acceptance of these delivery channels; or (iii) their impact on our business.

*Video Downloads to Portable Devices and Personal Computers.* Consumer offerings exist to download movies, music videos, television shows and other entertainment content to portable devices, in addition to downloads to personal computers. We cannot predict how broad the selection of movies for these existing and future offerings may become, consumer acceptance of watching movies on portable electronic devices and personal computers, as opposed to TVs and home entertainment systems, or the impact of this delivery channel on our business.

*Disposable DVDs.* The technology also exists for retailers to offer disposable DVDs, which allow a consumer to view a DVD for an unlimited number of times during a specified period of time, at the end of which the DVD becomes unplayable as a result of chemistry technology. We cannot predict the impact that this or other similar technologies will have on our business.

*Other Competition for Consumer Dollars and Leisure Time.* We compete generally for the consumer's entertainment dollar and leisure time with, among others, (i) movie theaters; (ii) Internet browsing, online gaming and other Internet-related activities; (iii) consumers' existing personal movie libraries, (iv) live theater; (v) sporting events, and (vi) music entertainment. Our results can therefore fluctuate depending on the desirability of other forms of entertainment.

***We believe that some degree of industry consolidation will be necessary in the in-store home video rental industry over the coming years. Should we not be successful in capitalizing on this industry consolidation, our financial results may be adversely affected.***

Based upon current industry projections, we believe that over-capacity exists in the video rental market and that, as a result, many video stores, including some of our own stores, will be forced to close in the future. If we are unable to capitalize on the store closings of our competitors, we may be unable to grow our market share and our financial results may be adversely affected. In addition, we have historically closed underperforming video stores and will continue to consider the closure of underperforming stores. We are currently reviewing many of our store leases and selecting sites to close or downsize based on store profitability.

***Overall revenues generated from the in-store home video industry are projected to continue to decline. A faster than anticipated decline in the in-store industry has in the past and may in the future adversely affect our business and our ability to implement our strategic initiatives.***

We have previously experienced challenges caused by the faster than anticipated decline in the worldwide in-store home video rental industry, for example, in 2005. We believe that the decline in 2005 was caused primarily by (i) a weak slate of titles released to home video; (ii) increased competition from retail mass merchant sales of low-priced DVDs, online rentals and other sources of in-home entertainment such as digital video recorders and other devices that are capable of downloading content for in-home viewing; (iii) competition from piracy in certain international markets; and (iv) competition from other forms of leisure entertainment. A faster than anticipated decline in the worldwide in-store home video rental industry in the future may similarly negatively impact our business and our ability to implement our strategic initiatives.

26

***Our revenues could be adversely affected due to the variability in consumer appeal of the movie titles and game software released for rental and sale.***

The quality of movie titles and game software released for rental and sale is not within our control, and our results of operations have from time to time reflected the variability in consumer appeal for such items. We cannot assure you that future releases of movie titles and game software will appeal to consumers and, as a result, our revenues and profitability may be adversely affected.

***We are dependent on the introduction and supply of new and enhanced game platforms and software to attract and retain our video game customers.***

The home video game industry has traditionally been a hit-driven business characterized by short product lifecycles and frequent introduction of new products. Historically, the lifecycle for game platforms has been about five years, with a limited number of platforms achieving success at any given time. The industry typically grows with the introduction of new hardware platforms and games, but tends to slow prior to the introduction of new platforms, as consumers hold back their purchases in anticipation of new platform and game enhancements. Additionally, during the slow period prior to the introduction of new game platforms, vendors often reduce their prices on existing game platforms and corresponding games, thereby reducing our gross profits for these items. Our video games business is, therefore, dependent on the introduction and penetration of new and enhanced game platforms and software in order to attract and retain our video game customers. Delays in the introduction and/or shipment of hardware or software or any failure to obtain sufficient product from our suppliers on favorable terms could negatively affect our business or increase fluctuations in our results of operations.

***Our financial results are impacted by seasonality, including the adverse impact caused by improved weather conditions.***

There is a distinct seasonal pattern to the home video and video games business, with slower business in April and May, due in part to improved weather and Daylight Saving Time, and in September and October, due in part to the start of school and the introduction of new television programs. The months of November and December have historically been our highest revenue months. While we expect these months to continue to make the largest contributions to our rental revenues, we believe the strength of rental revenues in these months has been and will continue to be negatively affected, to some degree, by consumers purchasing DVDs during the holiday season. Although our online and in-store rental subscription offerings have helped us mitigate, to some extent, the impact of seasonality and weather conditions on our business by providing a more steady revenue stream across all months, seasonality and weather are expected to continue to impact our business and our period-to-period financial results in the future.

***Piracy of the products we offer or the disregard of release dates by other retailers may adversely affect our operations.***

Although piracy is illegal, it is a significant threat to the home video industry. The primary methods of piracy affecting the home video industry are (i) the illegal copying of theatrical films at the time they are first run; (ii) the illegal copying of DVDs that are authorized by the studios solely for retail sale and/or rental by authorized retailers; and (iii) the illegal online downloading of movies. These methods of piracy enable the low-cost sale of DVDs as well as the free viewing and sharing of DVDs, both of which compete with rentals and sales by authorized retailers like us. Competition from piracy has increased in recent years due in part to developments in technology that allow for faster copying and downloading of DVDs.

Although piracy is a concern in the United States, it is having a more significant adverse affect on the home video industry in international markets. We cannot assure you that movie studios and others with rights in the product that we rent or sell can, or will, take steps to enforce their rights against piracy or that they will be successful in preventing the distribution of pirated content. Increases in piracy could continue to negatively affect our revenues. For example, in 2006, we closed all of our store locations in Spain, driven in part by the impact of piracy in that market.

Another risk that we face is the disregard by other home video retailers of the studios' specified release dates for their titles. If other home video retailers rent or sell product before the specified release dates (i.e., before us), we can be adversely affected, as the first weeks after a movie title's release typically represent a significant portion of the demand for that title. We cannot assure you that the studios can or will control such distribution and release practices, particularly in countries outside of the United States.

***We have made significant investments in our business, including in our online rental service. These investments have adversely affected and may continue to adversely affect our profitability.***

During 2006, we continued to invest in our online rental service and our business as part of our effort to enhance our competitiveness and our overall rental offering and to allow us to take advantage of emerging trends in home entertainment. We expect to continue to invest in our online rental service and other initiatives during 2007.

As of December 31, 2006, our online service built a subscriber base of approximately 2.2 million subscribers, including approximately 2 million paying subscribers. Our online rental service requires considerable ongoing investments in order to further increase our subscriber base and implement our plan to more fully integrate our online and in-store consumer offering. In late 2006, we introduced BLOCKBUSTER Total Access, our integrated online and in-store consumer offering. This integrated offering required approximately $20 million of incremental investments by us during the fourth quarter of 2006, including additional product for our stores and incremental labor costs. Additionally, we anticipate spending approximately $35 million in national media marketing expenses in addition to our other advertising expenses during the first quarter of 2007 to promote BLOCKBUSTER Total Access. We estimate that the cost of providing free in-store exchanges under the program is about $2 per subscriber per month, net of the benefits we receive from bringing more traffic into our stores and online. Our goal of further integrating our in-store and online offering and increasing our online subscriber base will require significant additional investment. We cannot assure you when or if our online rental service will become profitable.

The significant investments required to develop and implement our initiatives have in the past adversely affected our financial results and may adversely affect our financial results thereafter. For example, our financial results would be impacted by:

- our ability to effectively and timely prioritize and implement these and other initiatives;
- the extent and timing of our continued investment of incremental operating expenses and capital expenditures to continue to develop and implement our initiatives, and our corresponding ability to effectively control overall operating expenses and capital expenditures;
- our ability to timely implement and maintain the necessary information technology systems and infrastructure to support shifts in consumer preferences and any corresponding changes to our initiatives; and
- the impact of competitor pricing and product and service offerings.

***We have had limited experience with certain new customer proposition initiatives and cannot assure you when or if these or future initiatives will have a positive impact on our profitability.***

We have implemented and expect to continue to implement initiatives that are designed to enhance efficiency, customer convenience and our product offerings, including initiatives to further integrate our online and in-store consumer offering and to expand our online offerings to customers. For example, in late 2006, we introduced our BLOCKBUSTER Total Access online and in-store consumer offering. We have also previously announced that we expect to offer a digital delivery service some time this year. The implementation of new initiatives has involved, and will continue to involve, significant investments by us of time and money and could be adversely impacted by (i) our inability to timely implement and maintain the necessary information technology systems and infrastructure to support shifts in consumer preferences and any corresponding changes

28

to our operating model, including continued support for our initiatives and (ii) the extent and timing of our continued investment of incremental operating expenses and capital expenditures to continue to develop and implement our initiatives and our corresponding ability to effectively control overall operating expenses and capital expenditures. Because we have limited experience with some of our new customer proposition initiatives, we cannot assure you that they will be successful or profitable, including success in retaining customers. Our ability to effectively and timely prioritize and implement our initiatives will also affect when and if they will have a positive impact on our profitability.

*If the average sales and rental prices for our product are not at or above expected prices, our expected gross margins may be adversely affected.*

To achieve our expected revenues and gross margins, we need to sell and rent, as applicable, our product, including previously rented, retail and rental (whether in-store or online) product at or above expected prices. If the average sales or rental prices of such product are not at or above these expected prices, our revenues and gross margins may be adversely affected.

It is also important that we maximize our gross margins through our allocation of store space. We may need to turn our inventory of previously rented and retail product more quickly in the future in order to make room in our stores for additional DVDs, new customer proposition initiatives or to downsize the store. Therefore, we cannot assure you that in the future we will be able to rent or sell, on average, our product at or above the expected price.

Other factors that could affect our ability to rent or sell our product at expected prices include:

- consumer desire to rent any of our movies and games;
- consumer desire to own a particular movie or game;
- the amount of product available for rental or sale by others to the public; and
- changes in the price of product by the studios or changes by other retailers, particularly mass merchant retailers.

*Our business plan contemplates continued cost management efforts. Should we not achieve our cost management objectives, our financial results could be adversely affected.*

Our business plan and expectations for the future are based on management's assessments regarding cost management in 2007 and in the future, including controlling operating expenses and capital expenditures across our operations. To the extent our cost management objectives are unable to control costs, our financial results may be adversely affected.

*Our level of indebtedness may make it more difficult for us to pay our debts and more necessary for us to divert our cash flow from operations to debt service payments.*

Our total indebtedness as of December 31, 2006 was approximately $984.2 million. Our debt service obligations could have an adverse impact on our earnings and cash flows for as long as the indebtedness is outstanding.

Our indebtedness could have important consequences for our business. For example, it could:

- make it more difficult for us to pay our debts as they become due during general adverse economic and market or industry conditions because any related decrease in revenues could cause us to not have sufficient cash flows from operations to make our scheduled debt payments;
- limit our flexibility in planning for, or reacting to, changes in our business and the industry in which we operate, including limiting our ability to invest in our strategic initiatives, and, consequently, place us at a competitive disadvantage to our competitors with less debt;

- require a substantial portion of our cash flows from operations to be used for debt service payments, thereby reducing the availability of our cash flow to fund working capital, capital expenditures, acquisitions and other general corporate purposes;

- cause our trade creditors to change their terms for payment on goods and services provided to us, thereby negatively impacting our ability to receive products and services on acceptable terms; and

- result in higher interest expense in the event of increases in interest rates since some of our borrowings are, and will continue to be, at variable rates of interest.

Additionally, we could incur additional indebtedness in the future and, if new debt is added to our current debt levels, the risks above could intensify. Additional debt would further increase the possibility that we may not generate sufficient cash to pay, when due, interest on and other amounts due in respect of our indebtedness, and would further reduce our funds available for operations, working capital, capital expenditures, acquisitions and other general purposes. Additional debt may also decrease our ability to refinance or restructure our indebtedness, and further limit our ability to adjust to changing market conditions. If we or our subsidiaries add new debt to our current debt levels, the related risks that we and they now face could increase.

*We may not have sufficient cash flows from operating activities, cash on hand and available borrowings under our credit facilities to service our indebtedness.*

Our ability to make payments on and to refinance our indebtedness will depend on our ability to generate cash in the future. This, to some extent, is subject to general economic, financial, competitive, industry and other factors that are beyond our control. We cannot assure you that our future cash flow will be sufficient to meet our obligations and commitments. If we are unable to generate sufficient cash flow from operations in the future to service our indebtedness and to meet our other commitments, we will be required to adopt one or more alternatives, such as refinancing or restructuring our indebtedness, selling material assets or operations or seeking to raise additional debt or equity capital. We cannot assure you that any of these actions could be affected on a timely basis or on satisfactory terms or at all, or that these actions would enable us to continue to satisfy our capital requirements. In addition, our existing debt agreements, including the indenture governing our senior subordinated notes and our credit agreement, contain restrictive covenants which may prohibit us from adopting one or more of these alternatives, and any future debt agreements may contain similar restrictive covenants. Our failure to comply with these covenants could result in an event of default which, if not cured or waived, could result in the acceleration of all of our debts, which we may be unable to repay.

*Any failure by us to comply with any of the restrictions in our debt agreements could result in acceleration of our debt. Were this to occur, we might not have, or be able to obtain, sufficient cash to pay our accelerated indebtedness.*

The operating and financial restrictions and covenants in our debt agreements, including our credit agreement and the indenture governing our senior subordinated notes, may adversely affect our ability to finance future operations or capital needs or to engage in new business activities. The debt agreements restrict our ability to, among other things:

- declare dividends or redeem or repurchase capital stock;

- prepay, redeem or repurchase other debt;

- incur liens;

- make loans, guarantees, acquisitions and investments;

- incur additional indebtedness;

- engage in sale and leaseback transactions;

- amend or otherwise alter debt and other material agreements;

- engage in mergers, acquisitions or asset sales; and
- transact with affiliates.

In addition, our debt covenants require that we maintain certain financial measures and ratios. As a result of these covenants and ratios, we are limited in the manner in which we can conduct our business, and we may be unable to engage in favorable business activities or finance future operations or capital needs. Accordingly, these restrictions may limit our ability to successfully operate our business. A failure to comply with these restrictions or to maintain the financial measures and ratios contained in the debt agreements could lead to an event of default that could result in an acceleration of the indebtedness. During 2005, we were required to enter into three amendments to our credit agreement to modify or seek waivers for our financial covenants thereunder. For an additional discussion of these amendments, please refer to "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations-Liquidity and Capital Resources—Capital Structure."

Should the outstanding obligations under our credit agreement be accelerated and become due and payable because of our failure to comply with the applicable debt covenants in the future, we would be required to search for alternative measures to finance current and ongoing obligations of our business. If amounts outstanding under the credit agreement were called by the lenders due to a covenant violation, amounts under other agreements, such as the indenture governing our senior subordinated notes, could also become due and payable immediately. There can be no assurance that such financing will be available on acceptable terms, if at all. Our ability to obtain future financing or to sell assets could be adversely affected because a very large majority of our assets have been secured as collateral under the credit agreement. In addition, our financial results, our substantial indebtedness, our credit ratings and the declining rental industry in which we operate could adversely affect the availability and terms of our financing. Further, uncertainty surrounding our ability to finance our obligations has in the past caused some of our trade creditors to impose increasingly less favorable terms and future uncertainty could similarly result in unfavorable terms from our trade creditors. In addition, there are other situations (including a change in the composition of our Board of Directors, whereby the majority of directors who were serving on the Board at the time we entered into our credit agreement and indenture (or their successors or nominees) are no longer serving on the Board) where our debt may be accelerated and we may be unable to repay such debt. Any of these scenarios could adversely impact our liquidity and results of operations or force us to file for protection under the U.S. Bankruptcy Code.

*Uncertainty surrounding our ability to meet our financial obligations has in the past adversely impacted and could in the future adversely impact our ability to obtain sufficient product on favorable terms.*

During 2005, we entered into three amendments of our credit agreement pursuant to which certain covenants in our credit agreement were amended or waived. This, coupled with the continued declines and uncertainty in the rental industry, resulted in negative publicity surrounding our business. As a result, our flexibility with our suppliers was affected, both domestically and internationally. We cannot assure you that in the future our trade creditors will not change their terms for payment on goods and services provided to us or that we will continue to be able to receive products and services on acceptable terms.

*Our financial results could be adversely affected if we are unable to manage our inventory effectively or if we are unable to obtain or maintain favorable terms from our suppliers.*

Our purchasing decisions are influenced by many factors, including, among others, gross margin considerations and supplier product return policies. While much of our retail movie product in the United States, but not outside the United States, is returnable to vendors, our investments in retail movie inventory may result in excess inventories in the event anticipated sales fail to materialize. In addition, returns of our games inventory, which is prone to obsolescence risks because of the nature of the industry, are subject to negotiation with vendors.

Our purchasing decisions also involve predictions of consumer demand. While the historical growth of our in-store and online subscription programs, our elimination of extended viewing fees, our Guaranteed in Stock

program for select new release titles (whereby if a Guaranteed in Stock title is unavailable, customers will be given a rain check for a free rental of that title good for 30 days at the same store) and the free in-store rentals provided by our BLOCKUBSTER Total Access program have increased consumer demand for our products, these programs have increased the complexity of our purchasing decisions. In addition, the prevalence of multiple game platforms adds to the difficulty of accurately predicting consumer demand with respect to video games. The nature of and market for our products, particularly games and DVDs, also makes them prone to risk of theft and loss.

Our operating results could therefore suffer if we are not able to:

- obtain or maintain favorable terms from our suppliers with respect to such matters as copy depth, use of product, including without limitation fulfillment of online orders, and product returns;

- maintain adequate copy depth to maintain customer satisfaction;

- control shrinkage resulting from theft or loss; or

- avoid significant inventory excesses that could force us to sell products at a discount or loss.

Further, as discussed above, uncertainty surrounding our ability to finance our obligations has in the past caused some of our trade creditors to impose increasingly less favorable terms and future uncertainty could similarly result in unfavorable terms from our trade creditors.

### *Our results of operations could be materially adversely affected if our franchisees failed to pay our franchise fees.*

A portion of our revenues are derived from royalty fees through our franchising program. We may experience difficulties in collecting our franchise fees on a timely basis, or at all, for a variety of reasons, including the inability of our franchisees to achieve sufficient revenues and cash flows from their stores or to otherwise effectively operate their stores under challenging industry conditions. Lawsuits and other disputes with our franchisees may also reduce the amount of our royalties from franchise fees. Any failure by our franchisees to pay their franchise fees to us on time or at all could materially adversely affect our results of operations.

### *Any failure or inadequacy of our information technology infrastructure could harm our business.*

The capacity, reliability and security of our information technology hardware and software infrastructure and our ability to expand and update this infrastructure in response to our changing needs are important to the continued implementation of our new customer proposition initiatives, as well as the operation of our business generally. To avoid technology obsolescence and enable future cost savings and customer enhancements, we are continually updating our information technology infrastructure. In addition, we intend to add new features and functionality to our products, services and systems that could result in the need to develop, license or integrate additional technologies. Our inability to add additional software and hardware or to upgrade our technology infrastructure could have adverse consequences, which could include the delayed implementation of our new customer proposition initiatives, service interruptions, impaired quality or speed of the users' experience and the diversion of development resources. Our failure to provide new features or functionality to our systems also could result in these consequences. We may not be able to effectively upgrade and expand our systems, or add new systems, in a timely and cost effective manner and we may not be able to smoothly integrate any newly developed or purchased technologies with our existing systems. These difficulties could harm or limit our ability to improve our business. In addition, any failure of our existing information technology infrastructure could result in significant additional costs to us.

### *Our business model is substantially dependent on the functionality of our distribution centers.*

Our domestic distribution system for our store-based operations is centralized. We ship a substantial portion of the products to our U.S. company-operated stores through our distribution center. We also have 35 regional

U.S. distribution centers to support our domestic online DVD subscription service. If our distribution centers became non-operational for any reason, we could incur significantly higher costs and longer lead times associated with distributing our movies and other products. In international markets, we utilize a variety of distribution methodologies with similar risks to those in the United States.

***Our financial results have been and could further be negatively impacted by impairments of goodwill or other intangible assets required by SFAS 142 and the application of future accounting policies or interpretations of existing accounting policies.***

In accordance with Statement of Financial Accounting Standards No. 142, *Goodwill and Other Intangible Assets* referred to as "SFAS 142," we test goodwill and other intangible assets for impairment during the fourth quarter of each year and on an interim date should factors or indicators become apparent that would require an interim test. From 2002 through 2005, we took significant charges relating to the impairment of goodwill. See Notes 2 and 3 to the consolidated financial statements and "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations—Critical Accounting Estimates" in this Form 10-K.

A downward revision in the fair value of one of our reporting units could result in additional impairments of goodwill under SFAS 142 and additional non-cash charges. Any charge resulting from the application of SFAS 142 could have a significant negative effect on our reported net income. In addition, our financial results could be negatively impacted by the application of existing and future accounting policies or interpretations of existing accounting policies, including without limitation the impact of accounting policies related to our rental library, any continuing impact of SFAS 142 or any interpretation issued in connection with Statement of Financial Accounting Standards No. 123R, *Share-Based Payment.*

***We are subject to various litigation matters that could, if judgments were to be rendered against us, have an adverse effect on our operating results.***

We are a defendant in various lawsuits and may become subject to additional lawsuits in the future. If judgments were to be rendered against us in these lawsuits, our results of operations could be adversely affected. See Note 9 to the consolidated financial statements for a discussion of certain pending material litigation matters relating to our business.

***Our business and operations have been, and could further be, negatively impacted as a result of the proxy fight during 2005 and election of three dissident nominees to our Board of Directors. Further, if a subsequent proxy fight is waged against us and is successful or if dissidents otherwise gain control of our Board, we could be in default under our credit agreement and may be unable to finance a change of control offer under the indenture governing our senior subordinated notes or repay our bank debt should it become accelerated.***

On April 8, 2005, we were notified that a slate of dissident nominees would be proposed for election at our 2005 annual stockholders meeting. On May 11, 2005, the dissident nominees were elected by our stockholders to serve on our Board of Directors. As a result of the proxy contest and the subsequent elections of the dissident nominees, our business and operations have been, and may further be, negatively impacted. For example:

- we incurred substantial costs associated with the proxy contest;

- the proxy contest was disruptive to our operations; and

- dissention on our Board of Directors may impact our ability to effectively and timely implement our initiatives and to retain and attract experienced executives and employees.

Further, under the terms of our credit agreement and the indenture governing our senior subordinated notes, a change in the composition of our Board of Directors, including as a result of one or more director resignations, whereby the majority of directors who were serving on the Board at the time we entered into our credit

agreement and indenture (or their successors or nominees) are no longer serving on the Board, could constitute a change of control. If a subsequent proxy contest is waged against us and is successful or if dissidents otherwise gain control of our Board, an event of default could result under our credit agreement, and under the indenture, we may be required to make an offer for cash to purchase the notes at 101% of their principal amount, plus accrued and unpaid interest and additional interest, if any. We cannot assure you that we will have the financial resources necessary to purchase the notes upon a change of control or that we will have the ability to obtain the necessary funds on satisfactory terms, if at all. Further, our credit agreement prohibits the purchase of all of the outstanding notes prior to repayment of the borrowings under our credit agreement and any exercise by the holders of the notes of their right to require us to repurchase the notes will also cause an event of default under our credit agreement. We may be unable to repay any acceleration of our debts that may arise under this scenario.

*We have experienced senior management departures and if we lose key senior management or are unable to attract and retain the talent required for our business, our operating results could suffer.*

Our performance depends largely on the efforts and abilities of our members of senior management. Our executives have substantial experience and expertise in our business and have made significant contributions to our growth and success. We have experienced senior management departures recently. The unexpected future loss of services of one or more members of our senior management team could have an adverse effect on our business. We will need to attract and retain additional qualified personnel and develop, train and manage management-level employees. We cannot assure you that we will be able to attract and retain personnel as needed in the future. Please refer to Note 9 of Item 8 of this Form 10-K for additional information with respect to a pending matter relating to our Chief Executive Officer's 2006 bonus award.

*We are subject to governmental regulation particular to the retail home video industry and changes in U.S. or international laws may adversely affect us.*

Any finding that we have been, or are, in noncompliance with respect to, or otherwise liable under, the laws affecting our business could result in costs, including, among other things, governmental penalties or private litigant damages, which could have a material adverse effect on us. We are subject to various international and U.S. federal and state laws that govern the offer and sale of our franchises because we act as a franchisor. In addition, because we operate video stores and develop new video stores, we are subject to various international and U.S. federal and state laws that govern, among other things, the disclosure and retention of our video rental records and access to and use of our video stores by disabled persons, and are subject to various international, U.S. federal, state and local advertising, consumer protection, credit protection, franchising, licensing, zoning, land use, construction, trading activities, second-hand dealer, minimum wage and labor and other employment regulations, as well as laws and regulations relating to the protection and cleanup of the environment and health and safety matters. The international home video and video game industry varies from country to country due to, among other things, legal standards and regulations, such as those relating to foreign ownership rights; unauthorized copying; intellectual property rights; movie ratings, which in many countries are legal standards unlike the voluntary standards of the United States; labor and employment matters; trade regulation and business practices; franchising and taxation; environmental matters; and format and technical standards. Our obligation to comply with, and the effects of, the above governmental regulations are increased by the magnitude of our operations.

Changes in existing laws, including environmental and employment laws, adoption of new laws or increases in the minimum wage, may increase our costs or otherwise adversely affect us. For example, the repeal or limitation in the United States of certain favorable copyright laws would have an adverse impact in the United States on our rental business. Similarly, the adoption or expansion of laws in any other country to allow copyright owners to charge retailers more for rental product than for sell-through product could have an adverse impact on our rental business in that country.

*Any acquisitions we make involve a degree of risk.*

We have in the past, and may in the future, engage in acquisitions to expand our domestic and international rental and retail presence or to expand our consumer offerings. For example, during the past several years, we have made asset acquisitions of stores in the United States and in markets outside of the United States. We have also previously announced that we expect to provide a digital delivery service sometime this year, including through potentially acquiring or investing in an existing digital delivery company. If these or any future acquisitions are not successfully integrated with our business, our ongoing operations could be adversely affected. Additionally, acquisitions may not achieve desired profitability objectives or result in any anticipated successful expansion of the acquired businesses or concepts. Although we review and analyze assets or companies we acquire, such reviews are subject to uncertainties and may not reveal all potential risks. Additionally, although we attempt to obtain protective contractual provisions, such as representations, warranties and indemnities, in connection with acquisitions, we cannot assure you that we can obtain such provisions in our acquisitions or that they will fully protect us from unforeseen costs of the acquisition. We may also incur significant costs in connection with pursuing possible acquisitions, even if the acquisition is not ultimately consummated.

*We have assumed obligations pursuant to agreements with Viacom relating to certain real estate leases guaranteed by Viacom, which obligations may adversely affect our ability to negotiate renewals or modifications to a subset of such leases.*

In October 2004, we completed our divestiture from Viacom. We entered into an amended and restated initial public offering and split-off agreement with Viacom in connection with this divestiture. This agreement, which is referred to as the "IPO agreement," imposes various restrictions and limitations on our ability to renew or modify, in a manner that increases Viacom's potential liability, a subset of the leases guaranteed by Viacom, which could make it more difficult and expensive, and in some cases impossible, to renew or modify certain of these leases.

*We have also assumed obligations pursuant to the IPO agreement to maintain letters of credit in favor of Viacom, which obligations reduce our borrowing capacity.*

Pursuant to the IPO agreement, we have provided letters of credit, at Viacom's expense, for the benefit of Viacom to support Viacom's potential liability for certain real estate lease obligations of ours. The letters of credit reduce our borrowing capacity under the terms of our credit facilities by $150 million. Until the letters of credit or any renewals thereof are terminated, we anticipate any future or additional lenders may treat our letter of credit obligation as if it were outstanding indebtedness when assessing our borrowing capacity. Furthermore, if we are unable to renew or otherwise replace the letters of credit prior to their expiration as required by the IPO agreement, Viacom has the right to draw down the full amount of the outstanding letters of credit, which may cause us to borrow funds under our credit facility to reimburse the issuing bank. In either case, our obligation to maintain the letters of credit may restrict or prevent us from being able to borrow amounts necessary to engage in favorable business activities, consummate strategic acquisitions or otherwise fund capital needs.

*We, along with Viacom and certain of Viacom's related entities, are a party to two judgment sharing agreements arising out of two revenue-sharing antitrust cases. Should we, Viacom or Viacom's related entities incur liability with respect to such cases, we would be responsible for satisfying a portion of that liability.*

On November 9, 2001, we entered into a judgment sharing agreement with Viacom, Paramount Home Entertainment, Inc. ("Paramount"), Sumner Redstone and certain studio defendants in *Cleveland, et al. v. Viacom Inc., et al*, No. SA-99-CA-0783 in the United States District Court for the Western District of Texas and in *Merchant, et al. v. Redstone, et al.*, No. BC 244 270 in the Superior Court for the State of California, County of Los Angeles, whereby we, Viacom, Paramount and Mr. Redstone agreed to be responsible for an allocated

portion of any liability that arises out of either of the two revenue-sharing antitrust cases. No liability will arise from the *Cleveland* case as judgment was entered in favor of us and the other defendants and all appeals by plaintiffs failed. The *Merchant* case was appealed following judgment in our favor and remanded back to the trial court for further proceedings. On June 18, 2004, in connection with our split-off from Viacom, we entered into an agreement with Viacom, Paramount and Mr. Redstone, which we refer to as the Viacom entities, whereby we agreed to pay a percentage allocation of any liability arising from a judgment or from the November 9, 2001 judgment sharing agreement of 33.33% and the Viacom entities agreed to pay 66.67% of any such liability. We cannot assure you that we will not be held liable in the *Merchant* case. Therefore, we may become responsible for contributing one-third of any liability arising from such case.

### *Provisions in our charter documents and Delaware law could make it more difficult to acquire our Company.*

Our second amended and restated certificate of incorporation ("certificate of incorporation") and amended and restated bylaws ("bylaws") contain provisions that may discourage, delay or prevent a third party from acquiring us, even if doing so would be beneficial to our stockholders. Our bylaws limit who may call special meetings of stockholders to any officer at the request of a majority of our Board of Directors, the Chairman of the Board or the Chief Executive Officer of the Company. Our certificate of incorporation and bylaws provide that the bylaws may be altered, amended or repealed by the Board of Directors.

Pursuant to our certificate of incorporation, the Board of Directors may by resolution establish one or more series of preferred stock, having such number of shares, designation, relative voting rights, dividend rates, liquidation or other rights, preferences and limitations as may be fixed by the Board of Directors without any further stockholder approval. Such rights, preferences, privileges and limitations as may be established could have the effect of impeding or discouraging the acquisition of control of us, which could adversely affect the price of our equity securities.

In addition, Section 203 of the Delaware General Corporation Law may discourage, delay or prevent a change in control by prohibiting us from engaging in a business combination with an interested stockholder for a period of three years after the person becomes an interested stockholder.

## Item 1B.   *Unresolved Staff Comments*

None.

## Item 2.   *Properties*

Our corporate headquarters are located at 1201 Elm Street, Dallas, Texas 75270 and consist of 242,615 square feet of space leased pursuant to an agreement that expires on June 30, 2017. Our primary distribution center is located at 3000 Redbud Blvd., McKinney, Texas 75069 and consists of about 850,000 square feet of space leased pursuant to an agreement that expires on December 31, 2012. We have set up our payroll and benefits center in Spartanburg, South Carolina. We also lease and operate 35 online distribution centers spread strategically throughout the United States to support our domestic online rental service.

We have country head offices in Buenos Aires, Argentina; Toronto, Canada; Santiago, Chile; Uxbridge, England; Dublin, Ireland; Milan, Italy; and Mexico City, Mexico. For most countries in which we have company-operated stores, we maintain offices to manage our operations within that country.

We lease substantially all of our existing store sites. These leases generally have a term of five to ten years and provide options to renew for between five and ten additional years. We expect that most future stores will also occupy leased properties.

**Item 3.** *Legal Proceedings*

Information regarding our material legal proceedings is set forth in Note 9 to the consolidated financial statements, in Item 8 of Part II of this Form 10-K, which information is incorporated herein by reference.

**Item 4.** *Submission of Matters to a Vote of Security Holders*

None.

## PART II

### Item 5. *Market for Our Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities*

The shares of Blockbuster Class A and Class B common stock are listed and traded on the New York Stock Exchange, or "NYSE," under the symbols "BBI" and "BBI.B," respectively. Our Class A common stock began trading on August 11, 1999, following our initial public offering and our Class B common stock began trading on October 14, 2004, in conjunction with our divestiture from Viacom Inc. ("Viacom"). The following table contains, for the periods indicated, the high and low sales prices per share of our Class A and Class B common stock as reported on the NYSE composite tape and the cash dividends per share of our Class A and Class B common stock:

| | Blockbuster Class A Common Stock Sales Price | | Blockbuster Class B Common Stock Sales Price | | Cash Dividends per share of Common Stock |
|---|---|---|---|---|---|
| | High | Low | High | Low | (1) |
| Year Ended December 31, 2005: | | | | | |
| Quarter Ended March 31, 2005 | $ 10.04 | $ 8.35 | $ 9.49 | $ 8.12 | $ 0.02 |
| Quarter Ended June 30, 2005 | $ 10.65 | $ 8.76 | $ 10.18 | $ 8.32 | $ 0.02 |
| Quarter Ended September 30, 2005 | $ 9.21 | $ 4.17 | $ 8.65 | $ 4.00 | $ — |
| Quarter Ended December 31, 2005 | $ 5.74 | $ 3.19 | $ 5.40 | $ 2.96 | $ — |
| Year Ended December 31, 2006: | | | | | |
| Quarter Ended March 31, 2006 | $ 4.28 | $ 3.30 | $ 3.90 | $ 2.95 | $ — |
| Quarter Ended June 30, 2006 | $ 5.12 | $ 3.69 | $ 4.68 | $ 3.36 | $ — |
| Quarter Ended September 30, 2006 | $ 5.11 | $ 3.57 | $ 4.60 | $ 3.15 | $ — |
| Quarter Ended December 31, 2006 | $ 5.59 | $ 3.66 | $ 5.14 | $ 3.29 | $ — |

(1) Blockbuster historically paid a quarterly recurring cash dividend of $0.02 per share on both its Class A and Class B common stock, however, it has not paid a dividend since the second quarter of 2005. Blockbuster's Board of Directors may evaluate declaring quarterly cash dividends in the future.

The terms of our debt agreements, as discussed in "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources," limit Blockbuster's ability to repurchase common stock and pay dividends. Subject to these limitations, Blockbuster's Board of Directors may change Blockbuster's dividend practices from time to time and decrease or increase the dividend paid, or not pay a dividend, on Blockbuster's common stock based on factors such as results of operations, financial condition, cash requirements and future prospects and other factors deemed relevant by Blockbuster's Board of Directors.

The number of holders on record of shares of our Class A and Class B common stock as of February 1, 2007 was 1,192 and 852, respectively.

For information regarding Blockbuster's equity compensation plans, refer to the proxy statement to be filed for our 2007 annual meeting of stockholders incorporated by reference into Item 12 of Part III of this Form 10-K.

### Item 6. *Selected Financial Data*

The following table sets forth our selected consolidated historical financial data as of the dates and for the periods indicated. The selected statement of operations and balance sheet data for the years ended December 31, 2002 through 2006 are derived from our consolidated financial statements. The financial information herein may not necessarily reflect our results of operations, financial position and cash flows in the future or what our results of operations, financial position and cash flows would have been had Viacom not owned a large majority of our equity and voting interest during some of the periods presented.

# BLOCKBUSTER SELECTED CONSOLIDATED HISTORICAL FINANCIAL DATA

The following data should be read in conjunction with, and is qualified by reference to, the consolidated financial statements and related notes, and "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations" included elsewhere in this document.

| | Year Ended or at December 31, | | | | |
|---|---|---|---|---|---|
| | 2006(1)(2) | 2005(3)(4) | 2004(5)(6)(7) | 2003(8) | 2002(9) |
| | (In millions, except per share amounts) | | | | |
| **Statement of Operations Data:** | | | | | |
| Revenues | $5,523.5 | $5,721.3 | $ 5,932.5 | $5,826.1 | $ 5,506.1 |
| Gross profit | $3,047.8 | $3,157.3 | $ 3,553.8 | $3,474.1 | $ 3,173.0 |
| Impairment of goodwill and other long-lived assets (10) | $ 5.1 | $ 341.9 | $ 1,502.7 | $1,280.8 | $ — |
| Operating income (loss) | $ 79.1 | $ (388.0) | $(1,241.6) | $ (805.4) | $ 348.3 |
| Income (loss) before discontinued operations and cumulative effect of change in accounting principle | $ 67.9 | $ (548.3) | $(1,253.7) | $ (950.5) | $ 195.5 |
| Income (loss) per common share before discontinued operations and cumulative effect of change in accounting principle—basic | $ 0.30 | $ (2.98) | $ (6.92) | $ (5.28) | $ 1.09 |
| Income (loss) per common share before discontinued operations and cumulative effect of change in accounting principle—diluted | $ 0.30 | $ (2.98) | $ (6.92) | $ (5.28) | $ 1.08 |
| Income (loss) from discontinued operations, net of tax(11) | $ (13.2) | $ (39.8) | $ 4.9 | $ (23.8) | $ 0.4 |
| Cumulative effect of change in accounting principle | $ — | $ — | $ — | $ — | $(1,817.0) |
| Net income (loss) | $ 54.7 | $ (588.1) | $(1,248.8) | $ (978.7) | $(1,621.1) |
| Preferred stock dividends(12) | $ (11.3) | $ — | $ — | $ — | $ — |
| Net income (loss) applicable to common stockholders | $ 43.4 | $ (588.1) | $(1,248.8) | $ (978.7) | $(1,621.1) |
| Net income (loss) per common share—basic | $ 0.23 | $ (3.20) | $ (6.89) | $ (5.43) | $ (9.08) |
| Net income (loss) per common share—diluted | $ 0.23 | $ (3.20) | $ (6.89) | $ (5.43) | $ (8.93) |
| Cash dividends per common share | $ — | $ 0.04 | $ 0.08 | $ 0.08 | $ 0.08 |
| Special distribution per share | $ — | $ — | $ 5.00 | $ — | $ — |
| Weighted average shares outstanding—basic | 187.1 | 183.9 | 181.2 | 180.1 | 178.6 |
| Weighted average shares outstanding—diluted | 189.0 | 183.9 | 181.2 | 180.1 | 181.6 |
| **Balance Sheet Data:** | | | | | |
| Cash and cash equivalents | $ 394.9 | $ 276.2 | $ 330.3 | $ 233.4 | $ 152.5 |
| Total assets | $3,137.2 | $3,179.6 | $ 3,994.6 | $4,918.1 | $ 6,268.9 |
| Long-term debt, including capital leases | $ 899.5 | $1,121.6 | $ 1,119.7 | $ 75.1 | $ 408.7 |
| Stockholders' equity | $ 742.4 | $ 631.6 | $ 1,062.9 | $3,188.4 | $ 4,100.9 |

(1) During the first and second quarters of 2006, we recorded tax benefits resulting from the resolution of multi-year income tax audits.

(2) During 2006, we recognized $25.5 million of compensation expense related to share-based compensation as required by Statement of Financial Accounting Standards ("SFAS") 123 (revised), *Share-Based Payments* ("SFAS 123R").

(3) During 2005, we recorded a valuation allowance on our deferred tax assets in various jurisdictions.

(4) During 2005, we recognized $39.1 million of compensation expense related to share-based compensation as required by SFAS 123R.

(5) During 2004, we recognized a tax benefit as a result of specific federal income tax audit issues resolved during the first quarter of 2004.

(6) During the fourth quarter of 2004, in conjunction with our adoption of SFAS 123R, as described in Note 1 to the consolidated financial statements, we recognized $18.3 million of compensation expense related to share-based compensation. Also, as described in Note 1 to the consolidated financial statements, we adopted the expense recognition provisions of FASB Interpretation No. 28, *Accounting for Stock Appreciation Rights and Other Variable Stock Option or Award Plans* ("FIN 28") as of January 1, 2004. Because we applied the disclosure-only provisions of SFAS 123, *Accounting for Stock-Based Compensation* ("SFAS 123"), through September 30, 2004, the cumulative effect of change in accounting principle of $23.1 million, net of tax, recognized upon adoption of the expense recognition provisions of FIN 28 has not been reflected in our Consolidated Statements of Operations for the year ended December 31, 2004.

(7) During the third quarter of 2004, as described in Note 1 to the consolidated financial statements, we paid a $5.00 special distribution per share prior to our divestiture from Viacom.

(8) During the first quarter of 2003, we adopted SFAS No. 143, *Accounting for Asset Retirement Obligations* ("SFAS 143"), which requires the capitalization of any retirement costs as part of the total cost of the related long-lived asset and the subsequent allocation of the total expense to future periods. The application of this new accounting standard required us to record a $4.4 million cumulative effect of change in accounting principle, net of tax.

(9) During the first quarter of 2002, we adopted SFAS No. 142, *Goodwill and Other Intangible Assets* ("SFAS 142"), which eliminates the amortization of goodwill and intangible assets with indefinite lives and requires instead that those assets be tested for impairment at least annually. The application of the transition provisions of this new accounting standard required us to reduce our goodwill by $1.82 billion, net of tax.

(10) During 2006, 2005, 2004 and 2003 we recognized non-cash charges to impair goodwill and other long-lived assets, in accordance with SFAS 142 and SFAS No. 144, *Accounting for the Impairment or Disposal of Long-Lived Assets* ("SFAS 144"). See Note 2 to the consolidated financial statements for a discussion of impairment charges.

(11) During the twelve months ended December 31, 2006, Blockbuster completed the divestiture of Movie Brands Inc. and MOVIE TRADING CO. ® in addition to closing all of its store locations in Spain. During January 2007, Blockbuster also completed the sale of RHINO VIDEO GAMES®. In accordance with SFAS 144, these operations have been classified as discontinued operations.

(12) During the third quarter of 2005, as described in Note 4 to the consolidated financial statements, we completed a private placement of Series A cumulative convertible perpetual preferred stock. The first dividend payment was declared and paid in the first quarter of 2006.

## Item 7. *Management's Discussion and Analysis of Financial Condition and Results of Operations*

### (Tabular Dollars in Millions)

The following discussion and analysis should be read in conjunction with the consolidated financial statements and related notes appearing elsewhere in this document.

### Overview

Blockbuster Inc. is a leading global provider of in-home rental and retail movie and game entertainment, with over 8,000 stores in the United States, its territories and 22 other countries as of December 31, 2006.

#### 2006 Overview

Our 2006 results reflect our continued efforts to execute on a business plan that focused on growing our share of the overall movie rental business, controlling costs, maximizing our asset portfolio and improving our profitability and cash flow. We believe that the successful execution of this business plan is essential to combat the significant challenges which continue to face the in-store home video rental industry. As more fully described in "Item 1A. Risk Factors," we believe the decline in the worldwide in-store home video rental industry has been caused primarily by (i) increased competition from retail mass merchant sales of low-priced DVDs, online rentals and other sources of in-home entertainment such as digital video recorders and other devices that are capable of

downloading content for in-home viewing; (ii) competition from piracy in certain international markets; and (iii) competition from other forms of leisure entertainment.

During 2006, we invested significantly in our online subscription business because we believe that our ability to integrate our online subscription service with our in-store business provides us with a distinct competitive advantage. As such, on November 1, 2006, we completed another important step in the further integration of our online and in-store rental business with the introduction of BLOCKBUSTER Total Access™, a program that gives our customers the option of exchanging their DVDs through the mail or returning them to a nearby participating BLOCKBUSTER® store in exchange for free in-store movie rentals. The continued focus on our online business, including the introduction of BLOCKBUSTER Total Access, enabled us to exceed our goal of two million online subscribers by the end of 2006. As of December 31, 2006, we had approximately 2.2 million online subscribers, including approximately 2.0 million paying subscribers. While the industry has been undergoing significant change, we believe that Blockbuster is well positioned because we are one of the only home video retailers that can leverage our store locations, traffic and infrastructure to provide a customer offering both in-store and online.

Total revenues for 2006 decreased from 2005 primarily because of a decrease in our company-owned store base since 2005, resulting from accelerated actions to optimize our asset portfolio. In addition, our revenues were negatively impacted by the continued pressure on the in-store rental industry as discussed above. Despite these negative factors, our worldwide same-store movie rental revenues were positive, driven by a 3.1% increase in our domestic same-store movie rental revenues. Our gross profit was negatively impacted by the reduction in rental revenues and a decrease in rental gross margin due to increased promotional activities designed to drive rental activity, including previously rented product sales, and increased product purchases to improve customer satisfaction. The decrease in rental gross profit was partially offset by an increase in merchandise gross profit, despite an approximate $57 million decline in merchandise sales, primarily resulting from our focus on driving higher margin retail offerings and improved profitability on new movies and games.

The decrease in gross profit was more than offset by an approximately $222 million decrease in selling, general and administrative expenses from 2005 to 2006. The majority of this decrease came from our cost containment actions, which we began during the third quarter of 2005, including lowering store level compensation and corporate overhead, reducing advertising expenses and store closures.

Our financial performance in 2006 helped us to increase our operating cash flow by approximately $400 million in 2006 from 2005 and pay down approximately $155 million in debt during 2006, which includes the pay down of the entire outstanding balance under our revolving credit facility. Additionally, we expect to make prepayments of approximately $55 million on the term portions of our credit facilities during the first quarter of 2007 because we generated excess cash flow under our credit agreement and due to prepayment requirements from the sale of store operations and property and equipment. We also reduced our capital expenditures by approximately $61 million during 2006.

We continue to review our asset portfolio and, during 2006, we closed approximately 300 company-owned stores, net of store openings. Additionally, during 2006, we completed the divestiture of our MOVIE TRADING CO. locations and Movie Brands Inc. subsidiary, closed our store operations in Spain and sold our Taiwan subsidiary, coupled with a master franchise license. During the first quarter of 2007, we completed the sale of RHINO VIDEO GAMES.

## Outlook

For 2007, we remain focused on the execution of our business plan, which includes growing our share of the overall movie rental business through innovative consumer propositions, controlling costs and maximizing our asset portfolio. Based on current industry projections, we believe that some degree of industry consolidation will